IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **MAGGIE R. DEJONG**, <br><br> *Plaintiff,* <br><br> v. <br><br> **RANDALL G. PEMBROOK**, former Chancellor of Southern Illinois University Edwardsville; **JAMIE BALL**, Director for Equal Opportunity, Access, and Title IX Coordination; **MEGAN A. ROBB**, Program Director of the Art Therapy Counseling Graduate Program—each in his or her individual capacity, <br><br> *Defendants.* | Civil Case No. 22-1124 <br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff Maggie R. DeJong, for her complaint against Defendants, states:

**I. INTRODUCTION**

1.     There is a famous expression used to describe the free-speech protection guaranteed by the First Amendment: "I disapprove of what you say, but I will defend to the death your right to say it."[1]

2.     But our nation's public universities don't uphold that principle today. Instead, their message is often the opposite: "I not only disapprove of what you say, but I will keep you from saying it."

3.     And that's what this case is about: the unconstitutional, censorious actions of officials at Southern Illinois University Edwardsville (SIUE).

4.     Ms. DeJong, while a graduate student in the SIUE Art Therapy Program, posted materials to her social media accounts, sent messages to her fellow students, and engaged in in-class discussions on an array of topics, including religion,

---

[1] *Young v. Am. Mini Theatres, Inc.*, 472 U.S. 50, n.19 (1975), *quoting* S.G. Tallentyre (Evelyn B. Hall), *The Friends of Voltaire* 199 (1907).

politics, critical race theory, "Black Lives Matter," the criminal justice system, COVID-19 regulations, Marxism, and censorship.

5.   Ms. DeJong's beliefs, informed by her Christian faith and her conservative political views, were often not in line with those held by the Art Therapy Program faculty and students.

6.   As explained by Defendant Megan Robb, the Director of the Art Therapy Program, Ms. DeJong was entitled to express her viewpoints so long as they did not "harm" others.

7.   Under the Art Therapy Program's "anti-oppressive framework" and calls for "social justice," Ms. DeJong's speech was often seen as "harmful."

8.   Ultimately, Defendant Robb directed and encouraged Ms. DeJong's fellow art therapy students to report Ms. DeJong's purportedly "harmful," and fully protected, speech to University officials.

9.   And in February 2022, University officials—bowing to the cries of graduate school students claiming they were harmed and offended by Ms. DeJong's speech—issued three no-contact orders against Ms. DeJong prohibiting her from having "any contact" or even "indirect communication" with her fellow art therapy graduate students, "Student A.S.," "Student T.P.," and "Student S.W."

10.   The University issued the orders without giving Ms. DeJong the chance to defend herself and without telling her of the allegations against her.

11.   The orders simply informed Ms. DeJong that "upon information and belief . . . interactions between yourself and [Student A.S., Student T.P., and Student S.W.] would not be welcome at this time."

12.   The University failed to identify a single law, policy, or rule that Ms. DeJong violated. That's because she violated none.

13.   Instead, each order read: "This Order is not an indication of responsibility for a violation of University policy; rather, it is intended to prevent

2

interactions that could be perceived by either party as unwelcome, retaliatory, intimidating, or harassing."

14.     Though Ms. DeJong did not engage in *any* misconduct, University officials threatened "disciplinary consequences" if she violated the no-contact orders.

15.     And just in case Ms. DeJong strayed from the confines of the unconstitutional edicts, University officials copied an SIUE police lieutenant on each order.

16.     What's more Defendant Robb, in an email to the more than 30 students in the Art Therapy Program, publicly confirmed that Ms. DeJong was under investigation and accused her of "misconduct" and "oppressive acts."

17.     That disclosure violated the SIUE policy requiring University officials to "take all reasonable steps to ensure confidentiality" during an investigation of a student for alleged misconduct.

18.     It wasn't until March 10—well after University officials received the demand letter from Ms. DeJong's attorneys, nearly two weeks after officials rescinded the no-contact orders, and a month to the day after they issued the orders—that University officials finally disclosed to Ms. DeJong the materials underlying the orders and related investigation.

19.     That same day, they closed their baseless investigation of Ms. DeJong and advised that "no further inquiry or action is anticipated . . . ."

20.     The materials that University officials disclosed to Ms. DeJong comprised screenshots of her social media posts and text messages—captured by her fellow students, including T.P., over the course of at least a year.

21.     In those posts and messages, Ms. DeJong expressed her viewpoints on various topics, including religion, politics, critical race theory, "Black Lives Matter," the criminal justice system, COVID-19 regulations, Marxism, and censorship.

22.     The materials Defendants used to justify the no-contact orders included, for example, these social media posts by Ms. DeJong (*see generally* Ex. 15C):



23.     According to Student T.P., these and other social media posts "caus[ed] emotional harm to the students" in the Art Therapy Program and "worr[ied] [them] as future counselors and mental health advocates."

24.     Student T.P. even complained that because of Ms. DeJong's speech, T.P. couldn't "explore [her] own identity, which is a crucial part of becoming a culturally competent therapist."

25.     Rather than, for example, advise Student T.P. and the other complainants to ignore Ms. DeJong's speech they disagreed with, or respond

4

respectfully to it, University officials sacrificed Ms. DeJong's civil rights to appease the art therapy mob.

26.     And University officials then sat on their hands as Defendant Robb, her student followers, and even alumni dragged Ms. DeJong's reputation through the mud simply because she holds views on an array of topics that differ from those espoused in the echo chamber that is the SIUE Art Therapy Program.

27.     Because of Defendants' actions, Ms. DeJong has suffered sleeplessness, anxiety, chest pains, feelings of sadness, loss of appetite, weight loss, lack of concentration, harm to her reputation, and future loss of employment and wages.

28.     Defendants' actions violated Ms. DeJong's clearly established rights under the First and Fourteenth Amendment.

29.     What's more, Defendants acted with malice or a reckless and callous indifference to Ms. DeJong's federally protected rights.

## II. JURISDICTION & VENUE

30.     Ms. DeJong sues under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments to the United States Constitution. She seeks damages under 42 U.S.C. § 1983, declaratory relief under 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57, and reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

31.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

32.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of Illinois.

### III. PARTIES

33.     Ms. DeJong is a 2018 graduate of Indiana Wesleyan University (magna cum laude). She graduated from SIUE in May 2022 with a Master of Arts in Art Therapy Counseling.

34.     Southern Illinois University is a public university system organized and existing under the laws of the State of Illinois. SIUE is the St. Louis Metro East campus of the University system.

35.     Defendant Randall G. Pembrook served as chancellor of SIUE from August 1, 2016, to March 1, 2022.

36.     As chancellor, Defendant Pembrook was SIUE's chief executive officer and had supervisory authority over all of the University's activities.

37.     Defendant Pembrook was responsible for the enactment, amendment, and enforcement of university policies and procedures, including Policies 3C6 and 3C7—the University's unconstitutional "Non-Discrimination and Non-Harassment" policies.

38.     Defendant Pembrook was responsible for, among other things, the application and enforcement of Policies 3C6 and 3C7 through the three no-contact orders issued against Ms. DeJong.

39.     Defendant Ball is the Director of the SIUE Office of Equal Opportunity, Access, and Title IX Coordination (EOA Office). The EOA Office responds to and investigates complaints of discrimination and harassment made by SIUE employees and students.

40.     Defendant Ball directly reported to Defendant Pembrook until his retirement.

41.     Defendant Ball, among other things, issued the three no-contact orders against Ms. DeJong under Policies 3C6 and 3C7.

42.     Defendant Megan A. Robb is the Program Director of the SIUE Art Therapy Counseling Graduate Program and an associate professor.

43.     As the Director of the Art Therapy Program, Defendant Robb exercises general responsibility and supervision of the program.

44.     Her responsibilities include overseeing the program's assessment process, including setting the benchmarks, indicators, and criteria for passing the program; advising art therapy students or assigning advisors to them; ensuring the program's curriculum and related experiences prepare students for the art therapy profession; and addressing student grievances.

45.     Defendant Robb, among other things, retaliated against Ms. DeJong for her protected speech by directing and encouraging art therapy students to report Ms. DeJong to University officials for her speech, publicizing that Ms. DeJong was under investigation by the University, publicly accusing Ms. Dejong of "misconduct" and "oppressive acts," informing an alumna of the Art Therapy Program that Ms. DeJong was "burning bridges," and representing that she (Robb) was revising the annual review process for art therapy students to account for Ms. DeJong's alleged "misconduct" and "oppressive acts."

46.     Defendants are sued in their individual capacities.

47.     The acts and policies alleged in this complaint are attributed to Defendants, who acted under color of a statute, regulation, or custom of the State of Illinois.

## IV. FACTUAL ALLEGATIONS

### A.   The SIUE Art Therapy Program

48.     Art therapy is a mental health profession that integrates the disciplines of art and psychotherapy. It uses the creative process, pieces of art created during sessions, and third-party artwork to help people in treatment explore emotions, address unresolved conflicts, improve social skills, develop self-awareness, cultivate emotional resilience, and foster self-esteem. Art therapists are master-level clinicians who are trained in art and psychotherapy.

49.     The art therapy profession is small. As reported by the U.S. Bureau of Labor and Statistics in 2015, there were then only approximately 5,000 members of the American Art Therapy Association—the largest U.S. professional association for art therapists. Elkay Torpey, *You are a what? Art therapist*, U.S. Bureau of Labor Statistics (Apr. 2015), https://bit.ly/3MrKp8f (last viewed May 26, 2022).

50.     The SIUE Art Therapy Program is an accredited graduate-level program in which graduates earn a Master of Arts in Art Therapy Counseling.

51.     The Art Therapy Program received accreditation in October 2019. At the time of accreditation, the program was one of only twelve accredited schools nationally to offer art therapy counseling.

52.     The program, which requires around 60-semester hours for graduation, combines classroom instruction, research, and practicum experience.

53.     The program's faculty comprise only three professors: Defendant Robb, Professor Jayashree George, and Professor Shelly Goebl-Parker.

54.     To ensure individualized instruction, only around ten students are accepted into the program each fall.

55.     The program annually provides more than 10,000 hours of mental health services to the St. Louis and Metro East areas through practica, programming, and curriculum.

56.     On information and belief, a majority of the program's graduates who find employment in the therapy profession are employed in the Midwest, including the St. Louis and Metro East areas.

57.     The Art Therapy Program, which is based in the SIUE Department of Art and Design, claims a commitment "to creating a culture of compassion, empathy and understanding that recognizes and embraces our differences, both individually and societally."

## B.    Ms. DeJong's beliefs and viewpoints

58.     Ms. DeJong, as shown by her degree, met or exceeded the academic, clinical, research, ethical, and other requirements of the SIUE Art Therapy Program.

59.     But Ms. DeJong's religious beliefs and her views on topics like race essentialism, defunding the police, and freedom of speech were not in line with those espoused in the Art Therapy Program, by her professors, and by some of her fellow students.

60.     And Ms. DeJong expressed her viewpoints on social media, in discussions with fellow students, and in class when topically appropriate and with no substantial disruption of or material interference with University activities.

### 1)    Religious viewpoints

61.     Ms. DeJong is a devout Christian. Her Christian faith requires and motivates her to love God above anyone else, love her "neighbor" as herself, and tell others about the Gospel of Jesus Christ.

62.     While a student at SIUE, Ms. DeJong was open about her faith—in conversations with friends and classmates and on her social media.

63.     For instance, in November 2021, Ms. DeJong posted a meme to her social media account that read in part, "Don't be deceived" by "[n]ew age practices," and cited passages from the New and Old Testaments of the Bible. Ex. 15C at 10.

9

64.    Student S.W. sent Ms. DeJong a private message about the meme, asking, "Don't you think it's not okay to say a person's belief system is wrong?" *Id.*

65.    Ms. DeJong privately answered, "You ask a very good question [S.W.]:) In a relativist society, that can be viewed that way. But my personal held beliefs are grounded in objective truth by the gospel of Jesus Christ. My belief compels me to call out evil that holds people in spiritual bondage. You can totally disagree with me, and that is your right:) But it is out of love that I call this out. . . ." *Id.*

66.    Months later, in February 2022, Ms. DeJong found her statement— "[M]y personal held beliefs are grounded in objective truth by the gospel of Jesus Christ"—in another art therapy student's (or students') art project displayed in the SIUE Art & Design Building.

67.    The project was titled, "The Crushing Weight of Microaggressions."

68.    Ms. DeJong also discussed her Christian faith in class. Many times she explained why, because of her faith, she could not agree with something taught or discussed during class.

69.    Others in the program were also open about their beliefs, including beliefs in the supernatural. For instance, Student S.W., a self-proclaimed witch, said she wanted to learn how to cast spells. Another student, who was also a self-proclaimed witch, brought Wicca materials to class. And at times, professors discussed, and some students used, tarot cards during class.

**2)    Viewpoints on classifying people based on race**

70.    Consistent with her Christian faith, Ms. DeJong believes that every person is made in the image of God and every human life is infinitely valuable from conception until natural death. Ms. DeJong thus believes that racism—assigning negative attributes to and discriminating against individuals based on their race—is an unqualified evil.

71.   Ms. DeJong believes that any ideology that classifies individuals into groups based on their race and identifies them as perpetually privileged and oppressors or perpetually victimized and oppressed is sinful.

72.   She believes such ideologies foster racial division, stereotyping, and hostility; wrongfully assume that racism terminally infects our social institutions and laws, requiring their dismantling; and impute racism not just to those who consciously discriminate based on race, but also to those who do not actively participate in the prescribed dismantling of our social institutions.

73.   Ms. DeJong made these views known in various contexts while a student at SIUE, including in class and on her social media accounts.

74.   Her views conflicted with those taught in the Art Therapy Program.

75.   The Art Therapy program teaches that in any given society there are those who are privileged—usually "unearned" through the "accident" of birth—and others who are not, and that these differences create social rank based on power.

76.   In the United States, according to what the Art Therapy Program teaches, the privileged and powerful comprise "White" people and Christians, among others, while the perpetually victimized and oppressed comprise people of color and non-Christians.

77.   During her graduate studies, Ms. DeJong expressed her belief that the focus of counseling must be on the individual, not their identity group membership. She believes that viewing a client in terms of immutable characteristics—*e.g.*, race or sex—and tying these identities to socially constructed power struggles misses out on understanding who the client is as a unique individual.

### 3)   Viewpoints on "Black Lives Matter" and the defund-the-police movement

78.    The "Black Lives Matter" movement and calls to "defund the police" reached their crescendo during the 2020–2021 school year following the May 2020 murder of George Floyd by Derek Chauvin.

79.    Ms. DeJong believes that racially-motivated, unjustified use of force is an alarming violation of the state's duties to protect innocent human life and pursue the common good. But Ms. DeJong did not join in the calls to defund the police after George Floyd's death because she believes that the defund-the-police movement would, if successful, undermine the state's ability to fulfill its duties to protect innocent human life and pursue the common good.

80.    Ms. DeJong does not support the Black Lives Matter because of the organization's call to "disrupt the Western-prescribed nuclear family." Black Lives Matter, *What We Believe*, https://bit.ly/3LJLyHr (last viewed May 26, 2022).

81.    Ms. DeJong posted materials critical of Black Lives Matter to her social media accounts.

82.    Several of Ms. DeJong's professors and classmates expressed support for the Black Lives Matter organization, joined in the calls to defund the police, and claimed that law enforcement was systemically racist.

83.    In February 2021, Ms. DeJong wore a hat to class depicting the U.S. flag in black and white with a single thin-blue-line stripe. She wore the hat—colloquially known as a "Back the Blue" hat—to express her support for law enforcement.

84.    Defendant Robb noted during class that Ms. DeJong was wearing the hat and asked her to explain why she was wearing it.

85.    Ms. DeJong said that she was wearing the hat to show her support for law enforcement and explained her belief that defunding the police would hurt society.

86.     Rather than take off the hat to appease Defendant Robb and students who took offense to it, Ms. DeJong stood her ground as fellow students argued that the hat was a symbol of oppression and implied that Ms. DeJong was a racist for wearing it.

87.     A couple of months later, Defendant Robb brought up during class how DeJong had earlier worn a blue-lives-matter hat. DeJong's classmates expressed how the hat was "unsafe," comparing DeJong's wearing the hat to someone eating peanut butter near a person who is allergic to peanuts.

88.     Student S.W. commented (paraphrased): "You can like peanut butter all you want, but when someone goes into a space where there is peanut butter and it's going to hurt them, we gotta leave the peanut butter at home." Student S.W. added (paraphrased): "We all have to censor ourselves because we have to keep the peace. We have to do what is best for the general public."

89.     Another classmate asked Ms. DeJong (paraphrased): "Are you an activist or are you a therapist?"

90.     A third classmate suggested (paraphrased): "Maybe you could honor police officers with different symbols that are less of the collective identity."

### 4)   Viewpoints on the freedom of speech

91.     Ms. DeJong believes that the freedom of speech is a fundamental right protected by the First Amendment to the United States Constitution.

92.     So too does the Southern Illinois University Board of Trustees. As the Board recognizes, "Students enrolled in public institutions of higher education are entitled to the same First Amendment freedoms of association, speech and assembly . . . that they hold as citizens. Free discourse lies at the heart of the University's purpose . . . ." Bd. of Tr. Policy 3.C, https://bit.ly/3PH8H0e (last viewed May 26, 2022).

93.    In stark contrast, Defendant Robb told Ms. DeJong that she was entitled to her viewpoint "unless it harms others."

94.    During her second-year review, Ms. DeJong commented to her professors, "I feel this push [from the program] to not hold to my worldview. But it feels like you are coming from a very distinct worldview as well." She then asked, "So if we're really accepting this postmodern approach—like everybody has 'their truth'— then why am I not allowed to align with my truth?"

95.    Professor George answered, "It's actually a James Baldwin quote that's coming to mind to explain it. . . . 'We can disagree and still love each other unless your disagreement is rooted in my oppression and denial of my humanity and right to exist.'"

96.    Ms. DeJong responded, "But then who determines? Because that's a very dangerous thing, too. . . . It's very concerning who determines who silences whom."

97.    And Professor Goebl-Parker, in explaining her rating of Ms. DeJong's interpersonal skills, wrote about Ms. DeJong, "I have . . . been hearing about her social media presentation and behavior from outside of the program. . . . . [I]f I am hearing this, that is very problematic."

98.    Professor Goebl-Parker's reference to "social media presentation and behavior" was to Ms. DeJong's speech on her social media.

99.    On information and belief, Professor Goebl-Parker disagreed with the content of Ms. DeJong's social media posts and thus found them "very problematic."

100.    Yet each of the three art therapy professors have used their private social media accounts to express viewpoints on social or political matters.

101.    For example, in June 2020, Professor George posted to her Instagram account her artwork proclaiming, "Muslim lives matter," "Elephant lives matter," and "Elephants for Black Lives Matter," Ex. 16:

14



102.   Also in June 2020, Professor Goebl-Parker changed her profile picture on Facebook to read, "encourage your hopes, not your fears #BLACKLIVESMATTER," Ex. 17:



15

103.   And in November 2021, Defendant Robb posted this meme expressing her view about the acquittal of Kyle Rittenhouse and added: "Rittenhouse verdict provided another show of internalized superiority enacted," Ex. 18:



104.   The professors engaged in their speech on Black Lives Matter and the Kyle Rittenhouse trial with no institutional consequences.

105.   University officials did not investigate, publicly condemn, censor, issue restraining orders against, or otherwise discipline the professors.

106.   And rightly so.

107.   As the Board of Trustees recognizes, when professors "speak or write as citizens, they should be free from institutional censorship or discipline." Bd. of Tr. Stat. Art. VI, § 1.C, https://bit.ly/3lL3OWj (last viewed May 26, 2022).

108.   Ms. DeJong has no less constitutional freedom than her professors.

109.   But unlike her art therapy professors, Ms. DeJong faced institutional censorship and discipline for her speech, including a post on her social media

16

proclaiming "All Lives Matter" and another expressing support for the verdict in the Rittenhouse trial, Ex. 15C at 9, 11:

 

### C. The University issues three no-contact orders against Ms. DeJong without notice based solely on her protected speech.

110. On February 10, 2022, Defendant Ball issued three no-contact orders against Ms. DeJong related to Student A.S., Student T.P., and Student S.W. Exhibits 3, 4, and 5 are redacted copies of those orders.

111. Student T.P. and Student S.W., like Ms. DeJong, graduated from the art therapy program in May 2022 and were members of the eleven-student cohort that started in August 2019.

112. When Defendant Ball issued the orders in February 2022, Ms. DeJong, Student T.P., and Student S.W. shared two classes together and worked at the SIUE Early Childhood Center.

113.    Student A.S., also an art therapy master's student, started the program a year after Ms. DeJong. Though Student A.S. and Ms. DeJong were acquainted with each other, they were not in any of the same classes or working together when Defendant Ball issued the no-contact orders.

114.    The no-contact orders were substantively identical. Each prohibited Ms. DeJong from having "any contact" or even "indirect communication" with Student A.S., Student T.P., or Student S.W. Exs. 3, 4, 5.

115.    At no time before the University issued the no-contact orders did Student A.S., Student T.P., or Student S.W. ask Ms. DeJong not to speak to or otherwise communicate with them.

116.    In fact, at least two of the students—T.P. and S.W.—followed Ms. DeJong on her social media accounts and exchanged friendly messages with her before the University issued the no-contact orders.

117.    Defendant Ball offered no factual basis for the no-contact orders. She instead issued them "upon information and belief that interactions between yourself and [Student A.S., Student T.P., and Student S.W.] would not be welcome at this time." Exs. 3, 4, 5.

118.    In fact, Defendant Ball acknowledged in each order, "This Order is not an indication of responsibility for a violation of University policy; rather, it is intended to prevent interactions that could be perceived by either party as unwelcome, retaliatory, intimidating, or harassing." Exs. 3, 4, 5.

119.    Defendant Ball informed Ms. DeJong that the orders "will remain in effect during the remainder of the spring 2022 semester, unless I inform you that my office has modified or revoked [them]." Exs. 3, 4, 5.

120.    Each order also provided that "if at any time" Ms. DeJong "need[ed] to communicate" with the complainant, "you may do so only through me or a third party explicitly authorized by me." Exs. 3, 4, 5.

18

121.   Each order included a "CONFIDENTIALITY NOTICE" that "strictly prohibited" "unauthorized review, use, disclosure, or distribution, in any form whatsoever of this message and its parts." Exs. 3, 4, 5.

122.   Defendant Ball threatened "disciplinary consequences" if Ms. DeJong violated the no-contact orders. Exs. 3, 4, 5.

123.   Defendant Ball copied Lieutenant Adam Severit of the SIUE Police Department on each order. Exs. 3, 4, 5.

124.   By doing so, Defendant Ball intimated discipline of Ms. DeJong, including punishment under the law.

125.   On information and belief, Defendant Pembrook authorized the issuance of each no-contact order.

126.   Neither before nor when Defendant Ball issued the no-contact orders did she or anyone else from the EOA Office inform Ms. DeJong of the allegations against her or allow her the chance to be heard.

127.   On information and belief, Defendant Pembrook knew of these failures, approved of them, and took no action to remedy them.

### 1)   The SIUE non-discrimination and non-harassment policy and procedures

128.   Two university policies governed the no-contact orders: Policy 3C6 and Policy 3C7. Exhibits 1 and 2 are copies of those policies.

129.   Policy 3C6 is SIUE's "Non-Discrimination and Non-Harassment Policy." Defendant Pembrook authorized that policy effective August 29, 2017.

130.   Policy 3C6 incorporates Policy 3C7. Ex. 1, ¶ C.

131.   Policy 3C7 sets out the procedures for complaints of discrimination and harassment, except that the procedures for complaints of sexual harassment are set out in a separate university policy. Ex. 2 (introduction); *see also* Ex. 1, ¶ C (same).

19

### a)   Policy 3C6

132.   Policy 3C6 prohibits "[d]iscrimination against persons or groups of persons based on" one of the fifteen protected categories listed in the policy. Ex. 1, ¶ A. The policy also prohibits "[h]arassment of any kind." *Id.*

133.   Under the policy, "[d]iscriminatory harassment includes, but is not limited to, conduct (oral, written, visual or physical) directed against any person or group of persons because of" one of the fifteen protected categories listed in the policy, which "has the purpose of, or reasonably foreseeable effect of, creating an offensive, demeaning, intimidating or hostile environment for that person or group of persons." *Id.* The policy adds, "Such conduct includes, but is not limited to, objectionable epithets, demeaning depictions or treatment, and threatened or actual abuse or harm." *Id.*

134.   "Discrimination, including harassment, in any form covered by" Policy 3C6 is "strictly prohibited" and "subject to disciplinary action up to and including discharge." *Id.*, ¶ E.

135.   Defendants interpret Policy 3C6's prohibition against discrimination and harassment as encompassing protected speech.

### b)   Policy 3C7

136.   Policy 3C7 sets out "informal" and "formal" complaint procedures. Ex. 2, ¶¶ III, IV. The policy encourages individuals to utilize the informal procedures and to seek resolution at the lowest level of supervision. The policy charges the person who hears or receives an informal complaint with promptly taking the steps necessary to resolve the complaint, if appropriate, and with documenting the process. *Id.* ¶ III.

137.   In contrast, the formal complaint procedures require the complainant to file a written complaint with the EOA Office and establish certain deadlines based on that filing. *Id.* ¶ IV.

20

138.   Unless there are "special circumstances," formal complaints "shall be filed" with the EOA Office "within 60 days after the occurrence of the alleged discriminatory behavior." *Id.* ¶ II.

139.   Within five working days of receipt of the complaint, the EOA Office must "[m]eet with the complainant to obtain the details of the allegations and make a written record of the complaint" and "[i]nform the appropriate Vice Chancellor that a complaint has been filed." *Id.* ¶ IV.A.1.

140.   Policy 3C7 also sets out various rights a respondent has. Within ten working days of receipt of a formal complaint, the EOA Office must, among other things:

     a.   "Meet with the respondent and provide a copy of the allegations."

     b.   "Advise the respondent of the right to due process."

     c.   "Allow the respondent five (5) working days to respond to the allegations."

141.   Neither Defendant Ball nor anyone else from the EOA Office complied with these requirements with respect to Ms. DeJong.

142.   On information and belief, Defendant Pembrook knew of these failures, approved of them, and took no action to remedy them.

143.   Policy 3C7 authorizes sanctions against a respondent, but only if "there is a finding of discrimination against a student or student group." *Id.* ¶ VI.B. The authorized sanctions "include[e], but [are] not limited to," a letter of apology to the victim, counseling sessions, diversity training, transfer to another class or job, transfer to another housing unit, a letter of reprimand, a written warning, and probation, suspension, or dismissal from the University.

144.   Policy 3C7 mentions nothing about no-contact orders.

145.    The policy states that during the investigation period, the EOA Office "may assess whether interim measures are appropriate and make a recommendation for a consideration of such measures to the appropriate University official." *Id.* ¶ IV.E.

146.    But the policy fails to define, describe, or otherwise set out what constitutes an "appropriate" "interim measure[ ]."

147.    The policy also fails to define, describe, or otherwise establish any standard for imposing "interim measures."

148.    The policy also fails to require University officials—either before or when they impose the interim measures—to advise the respondent of the allegations against the respondent or give the respondent the opportunity to be heard.

149.    Nor does the policy permit an appeal of the imposition of interim measures. An appeal may instead be taken only from the EOA Office's final report of findings. *Id.* ¶ V.

150.    On information and belief, Defendants Pembrook and Ball interpret "appropriate" "interim measures" to include no-contact orders, such as those issued against Ms. DeJong.

151.    On information and belief, the EOA Office must confer with the chancellor before issuing a no-contact order as an "interim measure[ ]."

### 2)    Ms. DeJong's demand letter.

152.    When Ms. DeJong received the no-contact orders, she did not know why the University had issued them. But Ms. DeJong suspected that the University did so based on her protected speech.

153.    Thus, on February 23, 2022, Ms. DeJong, through her attorneys, sent a letter to Defendant Pembrook demanding that the University rescind the no-contact orders. Exhibit 6 is a redacted copy of that letter.

154.   On February 28—eighteen days after the University issued the orders—Defendant Ball emailed Ms. DeJong, informing her, "The No Contact Directive[s] as between yourself and [Student T.P.], [Student A.S.], and [Student S.W.] have been rescinded, effective immediately. Faculty who had been previously informed of the No Contact Directives have been informed that they have been rescinded." Exhibit 8 is a redacted copy of that email.

155.   It was not until March 10, 2022—one month to the day after the University issued the no-contact orders and over two weeks after receiving the demand letter—that University officials informed Ms. DeJong of the allegations against her.

**D.   The baseless allegations underlying the no-contact orders and the University's investigation of Ms. DeJong**

156.   On March 10, Ms. DeJong received an email from Defendant Ball that included a case-closure memorandum informing Ms. DeJong that the investigation was closed. Exhibit 15A is a redacted copy of that memorandum.

157.   Attached to the email were electronic copies of: (a) a formal complaint that Student T.P. filed against Ms. DeJong; (b) the materials that Student T.P. submitted in support of her complaint (voice memos from Ms. DeJong and screenshots of her social media posts and text messages); and (c) a screenshot of a text message from Ms. DeJong to Student S.W.

158.   Exhibit 15B is a redacted copy of Student T.P.'s formal complaint, Exhibit 15C is a redacted copy of the screenshots that Student T.P. submitted with her complaint, and Exhibit 15D is a redacted copy of the screenshot of Ms. DeJong's text message to Student S.W.

159.   Defendant Ball reviewed the materials comprising Exhibits 15B through 15D before issuing the no-contact orders.

23

160.    On information and belief, Defendant Pembrook was aware of the content of the materials before he authorized the no-contact orders.

### 1)    Student T.P.'s formal complaint and supporting materials

161.    Student T.P. filed her formal complaint and supporting materials on or about February 2, 2022—eight days before Defendant Ball issued the no-contact orders.

162.    Student T.P. alleged that Ms. DeJong committed "discrimination" and "harassment" based on "religion." Ex. 15B at 1.

163.    Directed to "[d]escribe the specific incident(s) of alleged discrimination, harassment, and/or retaliation," Student T.P. alleged: "Maggie DeJong has posted specific social media content that directly attacks and belittles my own religious beliefs. She has also specifically told me that I will not be saved when the rapture comes. She claims to have 'objective truth' and insists on making other belief systems silent." *Id.*, ¶ IV.a, at 2.

164.    Student T.P. left out of her complaint that the discussion she and Ms. DeJong had about the "rapture" (a) occurred well over a year before T.P. filed her complaint; (b) took place between the two then-friends at Ms. DeJong's apartment where T.P. was visiting; and (c) involved T.P. (an atheist) and Ms. DeJong making jokes about their respective situations if such an event ever occurred.

165.    Defendants never tried to learn anything from Ms. DeJong about that conversation and its circumstances before issuing the no-contact orders.

166.    Directed to "[s]tate specific reason(s) why you believe you were discriminated, harassed, and/or retaliated against because of your protected class status," Student T.P. wrote: "I believe this is discrimination/harassment because I feel unable to speak about my own belief system in a context where [Ms. DeJong] is present (all class settings) and explore my own identity, which is a crucial part of becoming a culturally competent therapist." *Id.*, ¶ IV.b, at 2.

167.    Student T.P. provided the names of eleven fellow art therapy students, including Students A.S. and S.W., who T.P. claimed "[were] willing to speak on their own experience with Maggie" and who "[had] either experienced harm or [had] witnessed its effect in [their] program." *Id.*, ¶ IV.d, at 2.

168.    Student T.P. described the materials she submitted to the EOA Office in support of her formal complaint as (a) "a collection of screenshots specifically causing emotional damage to students of [the art therapy] program," (b) "screenshots of conversations Maggie has had with individual students that worry us as future counselors and mental health advocates," and (c) "an audio recording of part of [a] conversation I had with Maggie." *Id.*, ¶ VI, at 3.

169.    The screenshots of Ms. DeJong's social media posts that Student T.P. submitted to the EOA Office were of posts Ms. DeJong made between early January 2021 through around January 17, 2022.

170.    The time stamps on many of the screenshots show that they were captured within hours, if not minutes, of their posting. *See, e.g.*, Ex. 15C at 1–3, 8–14.

171.    This includes the timestamps on posts that Ms. DeJong made in or about January 2021. *See id.* at 1–2.

172.    Thus the person (or persons) who captured Ms. DeJong's social media posts began doing so more than a year before Student T.P. filed her formal complaint.

173.    Student T.P. voluntarily looked at each of Ms. DeJong's social media posts that allegedly caused Student T.P. "emotional damage" and allegedly prevented her from "explor[ing] her own identity."

174.    Among the screenshots of Ms. DeJong's social media posts that Student T.P. submitted to the EOA Office were (*see generally* Ex. 15C):

   a. These memes about "institutional racism" and critical race theory, *id.* at 1, 8:

25




b.  This post concerning the riots at the United States Capitol, *id.* at 2:



c.  This pro-life post proclaiming "knowledge leads to life," *id.* at 8:



d.  This posts about COVID, *id.* at 12:



e.  This post about censorship, *id.* at 13:



f.  And Ms. DeJong's profile on Parler, a politically conservative social media platform, *id.* at 2:



2) **Defendant Robb meets with Student T.P. about Ms. DeJong's social media posts.**

175.  Student T.P. reported that she met with Defendant Robb on October 26 and November 19, 2021, and that Robb "directed [her] to have a conversation with Dean Kevin Leonard, who sent [her] to [the EOA Office]." Ex. 15B, ¶ IV.c, at 2.

176.  Among the items Student T.P. submitted to the EOA Office were screenshots of these materials from October 26, 2021 (subparagraphs a and b) and November 19, 2021 (subparagraphs c through f):

a.  A meme that Ms. DeJong posted to her Instagram Story comparing employment discrimination based on national origin and race to employment discrimination based on vaccination status, Ex. 15C at 3;

b.  A debate between Student T.P. and Ms. DeJong—initiated by T.P.— about that meme and other COVID-related matters, *id.* at 4–7;

c.  A text message that Ms. DeJong sent to Student T.P.'s then-roommate recommending a podcast titled, "Demons are Real," *id.* at 10;

d.  The post that Ms. DeJong made to her Instagram Story after the verdict in the trial of Kyle Rittenhouse stating in part, "Justice and truth prevailed in the face of lies and deception from the mainstream media trying to twist the narrative. . . ." *id.* at 9;

e.  The meme that Ms. DeJong posted to her Instagram Story, which read in part, "Don't be deceived" by "[n]ew age practices," and cited passages from the New and Old Testaments of the Bible, *id.* at 10;

f.  Student S.W.'s response to that meme asking, "Don't you think it's not okay to say a person's belief system is wrong?" *id.*; and

g.  Ms. DeJong's reply to Student S.W.'s question: "You ask a very good question . . . . In a relativist society that can be viewed that way. But my

personal held beliefs are grounded in objective truth by the gospel of Jesus Christ. . . ." *id.*

177.   On information and belief, Student T.P. met with Defendant Robb on October 26, 2021, and informed her of the content of Ms. DeJong's social media posts, including the October 26 social media posts and messages described in paragraphs 175(a) and (b) and depicted in Exhibit 15C.

178.   On information and belief, Student T.P. met with Defendant Robb on November 19, 2021, and informed her of the content of Ms. DeJong's social media posts, including the November 19 social media posts and messages described in paragraphs 175(c) through (f) and set depicted in Exhibit 15C.

179.   Defendant Robb knew that Ms. DeJong's social media posts, including the October 26 and November 19 social media posts and messages, were protected speech under the First Amendment.

180.   Even so, Defendant Robb directed Student T.P. to meet with Dean Leonard about Ms. DeJong's social media posts.

181.   On information and belief, Defendant Robb directed and encouraged other art therapy students to report Ms. DeJong's protected speech to University officials, including Dean Leonard and Defendant Ball.

### 3)   Student S.W.'s screenshot of Ms. DeJong's text message

182.   Neither Student A.S. nor Student S.W. submitted a formal complaint against Ms. DeJong.

183.   But Student S.W. did submit a screenshot of a text message from Ms. DeJong that Student S.W. allegedly "perceived as threatening." Ex. 15A.

184.   That message read: "[Student S.W.], I see where there are different forms of power, but I refuse to succumb to critical race theory. I think it is divisive and racist in its essence. So maybe I don't approach it your way, but I would be careful with your bold statements about me." Ex. 15D.

185.   Ms. DeJong's message did not communicate an expression of an intent to commit any act against Student S.W., let alone an unlawful act of violence.

186.   What's more, Ms. DeJong sent that message on or about March 26, 2021—over ten months before Defendant Ball issued the no-contact orders.

187.   That message was part of a string of more than 40 text messages between Ms. DeJong and Student S.W. sent between March 24 and 27, 2021, in which they expressed their respective viewpoints on several topics, including Second Amendment rights, gun laws, and "privilege and power."

188.   Immediately preceding the text message that Student S.W. "perceived as threatening," Student S.W. wrote: "You're an amazing, kind, caring person but not being able to identify any forms of power or privilege you have especially over other people is alarming to me."

189.   And after Ms. DeJong sent the allegedly threatening text message, Student S.W. never told Ms. DeJong that she perceived the message as threatening.

190.   In fact, the four-day text message debate between Ms. DeJong and Student S.W. ended with these messages:

DeJong:   I wanted to reiterate to you today how much I value you. Even though we don't agree. I see a beautiful heart and compassion for children in you. A strong warrior. And honestly a hilarious personality that I think is so necessary when we find ourselves taking ourselves to[o] seriously in our program. I just can't express enough the goodness you bring and I didn't want that to get washed out with our disagreement last night. That is more important that you know this, then [sic] anything else:) sorry if this follow up is annoying. But I am okay risking being annoying if it means I can express this to you. Have a beautiful Saturday. [flower emoji]

Student 3:   I know. Late night is not how I wanted that conversation to go. I value you too.

### 4)   Defendant Ball's case-closure memorandum

191.   Defendant Ball authored the March 10 case-closure memorandum addressed to Ms. DeJong. *See* Ex. 15A.

192.   The memorandum advised that "no further inquiry or action is anticipated with the . . . allegations" made against Ms. DeJong. *Id.*

193.   Defendant Ball wrote, "Upon review of the information associated with [Student T.P.'s] claim of religious harassment/discrimination, it was determined that Ms. DeJong's behavior did not rise to the level of any policy violation." *Id.*

194.   Ms. DeJong learned for the first time that the EOA Office's investigation of her also concerned an "Allegation of Harassment/Discrimination Based On Race." *Id.*

195.   Defendant Ball reported, "While conducting an initial inquiry relating to [Student T.P.'s allegation], it was learned that another student had recounted that Ms. DeJong addressed a Black person using a racial slur. It was also learned that the same Black person perceived that Ms. DeJong made a statement that was perceived as threatening. (Please see Attachment 2)"—i.e., Exhibit 15D. *Id.*

196.   The person Defendant Ball called "Black person" is Student S.W.

197.   On information and belief, the person Defendant Ball referred to as "another student" (Undisclosed Accuser) was Student A.S. or Student S.W.

198.   Undisclosed Accuser fabricated her allegation.

199.   There was no formal complaint alleging that Ms. DeJong addressed or referred to Student S.W.—or any other student—using a racial epithet. *Id.* What's more, Student S.W. never filed a formal complaint about the solitary text message that she allegedly "perceived as threatening."

200.   In fact, Defendant Ball reported that "these alleged incidents"—*i.e.*, the text message and alleged epithet—were "remote in time and outside of the 60-day time period during which a formal complaint can typically be accepted" under Policy

3C7. Ex. 15A; *see* Ex. 2, Policy 3C7, ¶ II (permitting extension of 60-day limitation period only "[u]nder special circumstances").

201.   University officials, including Defendants Pembrook and Ball, either knew or took no meaningful steps to discover that "these alleged incidents" occurred beyond the 60-day limitations period before issuing the no-contact orders.

202.   Had Undisclosed Accuser ever heard Ms. DeJong "address[ ] [Student S.W.] using a racial slur"—or had any evidence that Ms. DeJong ever made such a statement—Undisclosed Accuser would not have hesitated to immediately report Ms. DeJong.

203.   At the very least, Undisclosed Accuser would have done so within Policy 3C7's 60-day limitations period.

**E.   University officials refuse to publicly clear Ms. DeJong of wrongdoing as Defendant Robb stokes the flames with public accusations.**

**1)   The Art Therapy Program's pitchfork mentality**

204.   By at least February 22, 2022—a day before Ms. DeJong's counsel sent a demand letter to University officials and issued a press release—it was publicly known that the University had issued no-contact orders against Ms. DeJong.

205.   On February 22, during Ms. DeJong's practicum supervision class, students brought up that there was "tension" in the Art Therapy Program.

206.   Although the no-contact orders were not specifically mentioned by students during the class, it was clear that the students were aware of the orders and believed the orders were the basis of the tension.

207.   Ms. DeJong texted one of her classmates during class asking, "What is going on?" The classmate answered, "It's about some community action against micro aggressions and supposed racism in the program . . . . [S]upposedly people are doing no contact orders."

208.   Another student texted Ms. DeJong stating, "I'm sending you mental support Maggie." Ms. DeJong answered, "I'm trying not to cry."

209.   The adjunct faculty member who taught the class repeatedly asked Ms. DeJong to comment on the perceived tension.

210.   Ms. DeJong declined the faculty member's repeated requests to comment on the perceived tension.

211.   Ms. DeJong did not feel comfortable discussing either the perceived tension or the no-contact orders given the University's hair-trigger issuance of the orders and threatened discipline for violating them.

212.   The next week, on February 28, Ms. DeJong received a private message on Facebook from "Alumna One"—an SIUE alumna and art therapist at a local service provider where Ms. DeJong had interned the year before. Exhibit 9 is a redacted copy of that message.

213.   Ms. DeJong had recently interviewed Alumna One for an ethics class assignment.

214.   In her message, Alumna One said she (a) had "been informed of your harassment to your black colleague," (b) hoped "you didn't cause any harm to the black clients you had when you were [an intern]"; and (c) hoped "you pick a different career because there's no place for racism in a therapy office." Ex. 9.

215.   Alumna One also asked Ms. DeJong not to submit the interview as part of her ethics assignment. *Id.*

216.   The next day, March 1, the Art Therapy Program held a "community meeting" on campus.

217.   Ms. DeJong did not attend the meeting.

218.   On information and belief, Students A.S. and T.P. attended the meeting and the subject of the no-contact orders came up during the meeting.

219.    On information and belief, one or more students in attendance accused Ms. DeJong of denying that white supremacy existed and of being a racist.

220.    On information and belief, some students in attendance became enraged.

221.    Defendant Robb was present at the meeting.

222.    On information and belief, Defendant Robb took no steps during the meeting to quell the frenzy or dispel the allegations against Ms. DeJong.

223.    On March 2, 2022, Ms. DeJong, through counsel, emailed SIUE counsel requesting that the University email all the students and faculty in the Art Therapy Program stating that Ms. DeJong did not violate any university policy and that the no-contact orders were issued without complying with the procedures in Policy 3C7. Exhibit 10 is a redacted copy of that email.

224.    The University never sent the requested email.

### 2)    Defendant Robb publicly accuses Ms. DeJong of "burning bridges," "oppressive acts," and "misconduct."

225.    On March 2, Student S.W. emailed Ms. DeJong with the subject line, "Another thing Maggie did." Exhibit 11 is a redacted copy of that email.

226.    The body of the email included only an internet link.

227.    On information and belief, Student S.W. intended to send the email with a link to Defendant Robb (username: "mrobb"), but the autofill function in Student S.W.'s email caused her to mistakenly email Ms. DeJong ("mdejong").

228.    Ms. DeJong did not respond to Student S.W.'s email.

229.    About an hour later, Defendant Robb emailed the same internet link to Ms. DeJong and asked, "Would you like to talk?" Exhibit 12 is a copy of that email.

230.    Ms. DeJong did not respond to Defendant Robb's email.

231. The link was to a February 28 news article in The Daily Citizen titled, "University Orders Christian Grad Student to have 'No Contact' with Students Who Disagree with her Viewpoint." Exhibit 7 is a copy of the story.

232. Ms. DeJong was interviewed for the story.

233. The article identified Ms. DeJong as a third-year student in the SIUE Art Therapy Program, described the no-contact orders, and included statements by one of her attorneys. Ex. 7.

234. On or about March 2, Defendant Robb sent text messages to "Alumna Two"—an SIUE art therapy alumna and acquaintance of Ms. DeJong. Defendant Robb asked Alumna Two, "Have you seen the press [Ms. DeJong] is doing?" and remarked, "She's burning bridges." Exhibit 13 is a redacted copy of that text message string.

235. Defendant Robb sent these messages hoping Alumna Two would persuade Ms. DeJong to stop speaking to the media about the no-contact orders, the demand letter, and the Art Therapy Program.

236. Alumna Two answered, "I do not speak for her experience. As do I not know the entirety of it all. But in my experience, maybe some bridges need burned." *Id.*

237. That was not the response Defendant Robb had hoped for.

238. The next day, March 3, Defendant Robb emailed her fellow art therapy professors, Ms. DeJong, and the approximately 30 other art therapy students. Exhibit 14 is a copy of that email.

239. The email's subject line read: "follow up from [March 1] community meeting."

240. Defendant Robb "thank[ed]" the meeting's attendees for "sharing your honesty and commitment to anti-oppression . . . ." *Id.*

241.    The meeting, she said, "shed light onto our collective need to step up and into empowerment around ensuring anti-oppression acts in our community." *Id.*

242.    Defendant Robb then added: "We cannot comment on the *current investigation*; however, the art therapy program and SIUE does not have a clear policy or consequence to *oppressive acts*. Therefore, we are revising our annual student review to align with our mission statement. By ensuring documentation and remediation for both students' growing areas and *misconduct* whether in the classroom or outside." *Id.* (emphasis added).

243.    Defendant Robb's reference to "the current investigation" was to the EOA Office's then-ongoing investigation of Ms. DeJong.

244.    Before Defendant Robb's March 3 email, no University official had publicly stated that Ms. DeJong was even under investigation.

245.    That disclosure violated Policy 3C7's confidentiality requirement: "All parties involved in an investigation . . . are obligated to protect the privacy of all persons involved. The University will take reasonable steps to ensure confidentiality . . . ."

246.    Defendant Robb's March 3 email to the more than 30 addressees was not a "reasonable step[ ] to ensure confidentiality" of the University's investigation of Ms. DeJong.

247.    Given the context of the March 3 email, Defendant Robb implied to the more than 30 addressees that Ms. DeJong had committed "oppressive acts" and "misconduct."

248.    Defendant Robb's statement that "we are revising our annual student review [process]" to account for "oppressive acts" or "misconduct" not covered under any current SIUE or Art Therapy Program policy caused Ms. DeJong to fear that Robb would use the revisions to further punish Ms. DeJong's protected speech and prevent her from graduating.

37

     **3)**    **SIUE art therapy students and alumni add their names to a letter to the editor accusing Ms. DeJong of "racist, homophobic, and xenophobic rhetoric."**

249.    On March 27, 2022—continuing with Defendant Robb's false theme that Ms. Dejong had committed "oppressive acts" and "misconduct"—an art therapy student, "Student B.P.," emailed her fellow art therapy students, more than a dozen art therapy alumni, Defendant Robb, and the other two art therapy professors. The email's subject line read: "IMPORTANT! Community Meeting Response."

250.    The email—as well as the "collaborative Community Letter" attached to the email—concerned the March 1 community meeting and "recent articles . . . circulating due to a claim that our program/SIUE is intolerant of Christian viewpoints and silences students."

251.    Exhibit 19A is a redacted copy of the email, and Exhibit 19B is a copy of the letter.

252.    Though Ms. DeJong is not identified by name in either the email or the community letter, it is clear from their context that she was the subject of both.

253.    Student B.P. said the community letter would be published along with a then-upcoming news story and said, "If our letter resonates with you and you would be interested in having your name added to the bottom of this letter in support, it will be included when our story is published . . . ."

254.    Student B.P. added, "We welcome this letter to be shared and hope to continue this conversation." Ex. 19A.

255.    The letter read, in part, "[A] line is crossed when students use their belief system to justify racist, homophobic, and xenophobic rhetoric. When Christianity is used as a shield for bigotry, one perpetuates the historical abuses that have occurred and continues to cause tremendous harm. Unfortunately, our program has a history and current reality of students who use their beliefs to justify such

harmful rhetoric and action, which creates a toxic and harmful learning environment." Ex. 19B.

256.    The letter's authors added, "The three core faculty members have made a point to weave issues of intersectionality, critical self-reflexivity, and sociocultural awareness into most facets of our learning."

257.    The authors rhetorically asked: "If individuals cause harm to fellow students, how can we expect them to not cause harm to clients?" and "If the university expects to create art therapists who 'take reasonable steps to ensure that they are sensitive to differences that exist among cultures' . . . how can one overlook the harm currently being caused in our learning community by the failure to meet this outcome?" *Id.*

258.    The letter is devoid of any examples of "racist, homophobic, and xenophobic rhetoric" or other "harmful rhetoric and action" by Ms. DeJong.

259.    The letter, along with an article about the no-contact orders, was published in the SIUE student newspaper on April 14, 2022. *See Letter to the Editor: Belief Systems Should not justify prejudiced rhetoric*, The Alestle (Apr. 14, 2022), https://bit.ly/39T7B17 (last viewed May 26, 2022); Gabriel Brady, *Complaint filed in art therapy leads to legal action, students feeling neglected*, The Alestle (Apr. 14, 2022), https://bit.ly/3NxfmYT (last viewed May 26, 2022).

260.    Exhibit 20A is a copy of the letter to the editor, and Exhibit 20B is a copy of the article.

261.    The letter was reportedly "[s]igned" by 52 "past and present community members," made up of a nearly even split between Art Therapy Program students and alumni. Among the reported signatories was even an adjunct faculty member.

262.    The letter's authors and signatories "urg[ed] those who have exploited these matters to make a statement that calls for the end to the threats made against

members of our community" and "invite[d] these individuals to engage in open dialogue with us." Exs. 19B, 20A.

263.    For nearly three years, before the issuance of the no-contact orders, Ms. DeJong engaged in open dialogue with her professors and her fellow students—in the classroom, outside the classroom, and on social media.

264.    University officials, including Defendants, ultimately responded to that dialogue by:

  a.  encouraging Ms. DeJong's fellow students to report her protected speech;

  b.  issuing three no-contact orders against Ms. DeJong without notice or the chance to defend herself;

  c.  threatening "disciplinary consequences" if Ms. DeJong violated the orders;

  d.  copying a police officer on the orders;

  e.  publicizing that Ms. DeJong was under investigation;

  f.  publicly accusing Ms. DeJong of "burning bridges," "misconduct," and "oppressive acts"; and

  g.  threatening revisions to the annual review process to account for the type of "misconduct" and "oppressive acts" Ms. DeJong allegedly committed.

## F.    The effect of Defendants' unconstitutional actions on Ms. DeJong

265.    The no-contact orders censored Ms. DeJong's speech and restricted her physical movement.

266.    Further, during the eighteen days that the no-contact orders were in place, Ms. DeJong self-censored her speech and limited her movements out of fear that University officials would find that her speech or movements constituted "any

contact" or "indirect communication" with Student A.S., Student T.P., or Student S.W. or a "form of harassment, retaliation, or intimidating behavior," and thus violative of the no-contact orders. Exs. 3, 4, 5.

267.   During that same period, Ms. DeJong limited when and where she went on campus—*e.g.*, for work, class, and weekly mandatory COVID testing—out of fear that she would encounter Student A.S., Student T.P., or Student S.W. and that university officials would find such contact as violative of the no-contact orders.

268.   Even after Defendant Ball issued the case-closure memorandum on March 10, Ms. DeJong continued to self-censor her speech and limit her movements out of fear that university officials would find her speech or movements as "retaliation" and thus "grounds for disciplinary action." Ex. 15A

269.   After reading Defendant Robb's accusation about Ms. DeJong "burning bridges" and Robb's March 3 accusing her of "misconduct" and "oppressive acts," Ms. DeJong self-censored her speech out of fear that Robb was "revising our annual student review [process]" to account for "oppressive acts" or "misconduct" not covered under any current SIUE or Art Therapy Program policy to further punish Ms. DeJong's protected speech and prevent her from graduating.

270.   Defendants' unconstitutional actions caused more than censorship of Ms. DeJong's speech and restrictions of her movement.

271.   Because of Defendants' unconstitutional actions, Ms. DeJong has suffered sleeplessness, anxiety, chest pains, feelings of sadness, loss of appetite, weight loss, lack of concentration, harm to her reputation, and future loss of employment and wages.

**COUNT ONE**
**Violation of the First Amendment**
**Retaliation**

272.    Ms. DeJong repeats each of the allegations in paragraphs 1–271.

273.    Ms. DeJong brings this count against all Defendants.

274.    The First Amendment's Free Speech Clause prohibits public universities and their officials from retaliating against or disciplining a student for their constitutionally protected speech.

275.    Ms. DeJong engaged in protected speech when she (a) posted materials to her social media accounts, sent messages to her fellow students, and engaged in in-class discussions on topics such as religion, politics, critical race theory, Black Lives Matter, the criminal justice system, COVID-19 regulations, Marxism, and censorship; (b) sent the demand letter to Defendant Pembrook; and (c) spoke to the media about the no-contact orders.

276.    Defendants Pembrook and Ball intentionally issued three no-contact orders against Ms. DeJong and threatened "disciplinary consequences" if she violated the orders.

277.    Ms. DeJong's protected speech was at least a motivating factor in their decisions to take these actions.

278.    Defendant Robb intentionally directed and encouraged art therapy students to report Ms. DeJong's speech to University officials, publicized that Ms. DeJong was under investigation, publicly accused Ms. DeJong of "misconduct" and "oppressive acts," and promised to revise the annual review process to account for such "misconduct" and "oppressive acts."

279.    Ms. DeJong's protected speech was at least a motivating factor in Defendant Robb's decision to take these actions.

280.    Because of Defendants' actions, Ms. DeJong self-censored her speech and limited her physical movements.

281.   Defendants' actions would likely deter an ordinary person in Ms. DeJong's position from engaging in similar speech.

### COUNT TWO
### Violation of the First Amendment
### Content and Viewpoint Discrimination

282.   Ms. DeJong repeats each of the allegations in paragraphs 1–271.

283.   Ms. DeJong brings this count against all Defendants.

284.   The First Amendment's Free Speech Clause prohibits discrimination against speech based on its content and viewpoint.

285.   Defendants Pembrook and Ball issued the three no-contact orders against Ms. DeJong based on her social media posts, personal communications, and in-class discussions on various topics, including religion, politics, critical race theory, Black Lives Matter, the criminal justice system, COVID-19 regulations, Marxism, and censorship.

286.   Based on that same speech, as well as Ms. DeJong's demand letter and speech to the media, Defendant Robb directed and encouraged art therapy students to report Ms. DeJong's speech to University officials, publicized that Ms. DeJong was under investigation, publicly accused Ms. DeJong of "misconduct" and "oppressive acts," and promised to revise the annual review process to account for such "misconduct" and "oppressive acts."

287.   Other students in the Art Therapy Program, as well as faculty members, have spoken about and expressed their viewpoints on the same or similar topics. Yet University officials, including Defendants, did not take any action against those speakers based on their speech.

288.   For example, University officials, including Defendants, did not take any action against:

43

    a. any student for creating the art display claiming that Ms. DeJong's statement—"my personal held beliefs are grounded in the objective truth by the gospel of Jesus Christ"—constituted a "microaggression";

    b. Ms. DeJong's fellow art therapy students for expressing their viewpoints about her wearing a "Back the Blue" hat;

    c. Student B.P. for her March 27 email, with attached "collaborative Community Letter," accusing Ms. DeJong of "racist, homophobic, and xenophobic rhetoric" and encouraging the nearly 50 addressees to "share[ ]" the letter;

    d. the art therapy students and adjunct faculty member for signing the letter and publishing it in the student newspaper;

    e. Professor George for her Instagram post declaring "Muslim lives matter," "Elephant lives matter," and "Elephants for Black Lives Matter"; or

    f. Professor Goebl-Parker for her Facebook profile that read, "encourage your hopes, not your fears #BLACKLIVESMATTER."

289. Nor did University officials, including Defendants Pembrook and Ball, take any action against Defendant Robb for her expressing disapproval of Ms. DeJong wearing a "Back the Blue" hat, posting on social media about the acquittal of Kyle Rittenhouse, or accusing Ms. DeJong of "misconduct" and "oppressive acts" in an email to the more than 30 art therapy students, among other things.

290. What's more, Policy 3C6's prohibition against "[h]arassment of any kind," which includes "discriminatory harassment," *see* Ex. 1, ¶ A, is a content-based speech restriction.

291. The definition of "discriminatory harassment" draws facial distinctions by defining regulated speech by subject matter—that is, speech about "any person or groups of persons" who belong to one of the policy's fifteen protected categories: "race,

color, national origin, ancestry, religion, sex, sexual orientation including gender identity, marital status, civil union status, age, physical or mental disability, military status, or unfavorable discharge from military service." *Id.*

292.   The Free Speech Clause's prohibition against content- and viewpoint-based discrimination not only demands that public universities refrain from that discrimination, but also requires universities to limit the discretion of their officials through narrow, objective, and definite standards to protect against content- and viewpoint-based discrimination.

293.   Policies 3C6 and 3C7 contain no guidelines sufficient to prevent University officials, including Defendants, from exercising unbridled discretion to target speech whose content and viewpoints they disagree with.

294.   Policy 3C6 defines "discriminatory harassment" using the open-ended prefatory phrase "includes, but is not limited to." *Id.*

295.   The speech proscribed under Policy 3C6's definition of "discriminatory harassment" "includes, but is not limited to" speech that has the "reasonably foreseeable effect of . . . creating an offensive [or] demeaning . . . environment" for any person or group of persons belonging to one of the policy's fifteen protected categories. *Id.*

296.   Policy 3C6 grants University officials unbridled discretion to target disfavored speech that they think might create an "offensive [or] demeaning" environment.

297.   Further, Policy 3C7 grants University officials unbridled discretion to impose "interim measures" against a student while investigating allegations that the student's speech violated Policy 3C6, without making any finding that the student had violated Policy 3C6.

298.   Defendants applied Policies 3C6 and 3C7 and exercised their unbridled discretion to target Ms. DeJong's protected speech.

299.    Neither Defendants' actions against Ms. DeJong nor Policies 3C6 and 3C7 supported a compelling government interest and were not narrowly tailored to any such interest.

**COUNT THREE**
**Violation of the First Amendment**
**Prior Restraints**

300.    Ms. DeJong repeats each of the allegations in paragraphs 1–271.

301.    Ms. DeJong brings this count against Defendants Pembrook and Ball.

302.    Threatening to censor future speech is a prior restraint.

303.    Policies 3C6 and 3C7 threaten to censor future speech. *See* Exs. 1, 2.

304.    Policy 3C7 sets out a non-exclusive list of penalties, including "interim measures," for violating Policy 3C6. Ex. 2, ¶¶ IV.E, VI.B.

305.    Policy 3C6 prohibits "discriminatory harassment." Ex. 1, ¶ A.

306.    Policy 3C6 defines "discriminatory harassment" using the open-ended prefatory phrase "includes, but is not limited to." *Id.*

307.    The "conduct" proscribed under Policy 3C6's definition of "discriminatory harassment" "includes, but is not limited to" speech that has the "reasonably foreseeable effect of . . . creating an offensive [or] demeaning . . . environment" for any person or group of persons belonging to one of the policies fifteen protected categories: "race, color, national origin, ancestry, religion, sex, sexual orientation including gender identity, marital status, civil union status, age, physical or mental disability, military status, or unfavorable discharge from military service." *Id.*

308.    Policy 3C6 adds that "[h]arassment of any kind is strictly prohibited." *Id.*

309.    Defendants applied Policies 3C6 and 3C7 when they imposed the no-contact orders against Ms. DeJong.

46

310.   Defendants imposed the no-contact orders based on Ms. DeJong's protected speech.

311.   The no-contact orders threatened "disciplinary consequences" if Ms. DeJong violated the no-contact orders. Exs. 3, 4, 5.

312.   Each no-contact order barred Ms. DeJong from having "any contact" with one of the specified students—Student A.S., Student T.P., or Student S.W.— "either on or off campus, in person or through another party, by telephone, letter, e-mail, or other electronic media, or by any other means." Exs. 3, 4, 5.

313.   Each no-contact order barred Ms. DeJong from "engag[ing] in indirect communication" with the specified student "via social media or any other means." Exs. 3, 4, 5.

314.   Policies 3C6 and 3C7 and the application of those policies to Ms. DeJong did not support a compelling government interest and were not narrowly tailored to achieve any such interest.

315.   The no-contact orders issued against Ms. DeJong did not support a compelling government interest and were not narrowly tailored to achieve any such interest.

## COUNT FOUR
## Violation of the First Amendment
## Overbreadth

316.   Ms. DeJong repeats each of the allegations in paragraphs 1–271.

317.   Ms. DeJong brings this count against Defendants Pembrook and Ball.

318.   Policy 3C6 prohibits "discriminatory harassment."

319.   Policy 3C6 defines "discriminatory harassment" using the open-ended prefatory phrase "includes, but is not limited to." Ex. 1, ¶ A.

320.   The "conduct" proscribed under Policy 3C6's definition of "discriminatory harassment" "includes, but is not limited to" speech that has the "reasonably foreseeable effect of . . . creating an offensive [or] demeaning . . .

47

environment" for any person or group of persons belonging to one of the policies fifteen protected categories: "race, color, national origin, ancestry, religion, sex, sexual orientation including gender identity, marital status, civil union status, age, physical or mental disability, military status, or unfavorable discharge from military service." Ex. 1, ¶ A.

321.    Policy 3C6 adds that "[h]arassment of any kind is strictly prohibited." *Id.*

322.    Policies 3C6 and 3C7 regulate a substantial amount of constitutionally protected speech in relation to any plainly legitimate sweep.

323.    Defendants applied Policies 3C6 and 3C7 to retaliate against, discriminate against, punish, censor, and otherwise limit Ms. DeJong's protected speech.

### COUNT FIVE
### Violation of the Fourteenth Amendment
### Procedural Due Process and Void for Vagueness

324.    Plaintiff repeats each of the allegations in paragraphs 1–271.

325.    Ms. DeJong alleges this count against Defendants Pembrook and Ball.

326.    The Due Process Clause of the Fourteenth Amendment prohibits public universities from disciplining students without giving them notice of the allegations against them and an opportunity to be heard before an impartial tribunal.

327.    Defendants disciplined Ms. DeJong when they issued the no-contact orders against her based on her protected speech and threatened further discipline if she violated the orders.

328.    Defendants did not give Ms. DeJong notice of the allegations against her or the opportunity to be heard before an impartial tribunal before issuing the no-contact orders.

329.    Nor did Defendants set a hearing after the no-contact orders were issued to determine whether to keep the orders in place after a certain point.

48

330.   In fact, each order was to "remain in effect during the remainder of the spring 2022 semester" unless the EOA Office informed Ms. DeJong that the order was "modified or revoked." Exs. 3, 4, 5.

331.   Policy 3C7 is silent about the process a student must be afforded before imposing "interim measures," such the no-contact orders issued against Ms. DeJong, or what standard University officials must meet before imposing "interim measures." Ex. 2, ¶ IV.E.

332.   The Due Process Clause also requires that a public university's policies and orders provide adequate notice of what they prohibit.

333.   Policy 3C6 is void for vagueness.

334.   The "conduct" proscribed under Policy 3C6's definition of "discriminatory harassment" "includes, but is not limited to" speech that has the "reasonably foreseeable effect of . . . creating an offensive [or] demeaning . . . environment" for any person or group of persons belonging to one of the policy's fifteen protected categories: "race, color, national origin, ancestry, religion, sex, sexual orientation including gender identity, marital status, civil union status, age, physical or mental disability, military status, or unfavorable discharge from military service." Ex. 1, ¶ A.

335.   Policy 3C6 does not define what an "offensive [or] demeaning . . . environment" is.

336.   Nor could it, because that phrase is inherently subjective.

337.   What's more, as evidenced by Policy 3C6's use of the open-ended prefatory phrase "includes, but is not limited to" to define "discriminatory harassment," the definition is not limited to the "oral [or] written" "conduct"—or any other conduct—listed in the definition.

49

338.   These terms, among others used in Policy 3C6, were incapable of providing meaningful guidance to Ms. DeJong or to University officials, including Defendants, who enforced them.

339.   Defendants applied Policy 3C6 in issuing the three no-contact orders against Ms. DeJong.

**REQUEST FOR RELIEF**

Plaintiff Maggie R. DeJong requests that this Court:

A.   Award compensatory, nominal, and punitive damages for the violations of Plaintiff's constitutional rights;

B.   Enter judgment declaring that Defendants violated Plaintiff's constitutional rights;

C.   Enter judgment declaring that the no-contact orders were unconstitutional;

D.   Enter judgment declaring that these provisions of Policy 3C6 and Policy 3C7 were unconstitutional, both facially and as applied:

   1.   Policy 3C6's definition of "discriminatory harassment," Ex. 1, ¶ A;

   2.   Policy 3C6's prohibition against "harassment of any kind," *id.*; and

   3.   Policy 3C7's grant of unrestrained discretion to University officials to impose "interim measures" and to do so without due process under the law, Ex. 2, ¶ IV.E; and

E.   Award reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

Respectfully submitted this 31st Day of May, 2022.

Tyson C. Langhofer*
VA Bar No. 95204
Mathew W. Hoffmann*
DC Bar No. 1617417
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
Telephone: (571) 707-4655
Facsimile: (571) 797-4790
tlanghofer@ADFlegal.org
mhoffmann@ADFlegal.org

/s/Greggory R. Walters
*Lead Counsel*
IL Bar No. 6256826
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
Facsimile: (480) 444-0028
gwalters@ADFlegal.org

Michael J. Cork
IL Bar No. 0518395
5754 N. Delaware St.
Indianapolis, IN 46220-2528
Telephone: (317) 517-4217
cork0@icloud.com

*Counsel for Plaintiff*

*\*Pro hac vice application forthcoming*

### DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury for all issues so triable.

/s/Greggory R. Walters
Counsel for Plaintiff