## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

**MAGGIE R. DEJONG,**

        **Plaintiff,**

**v.**                                                **Case No. 3:22-CV-01124-NJR**

**RANDALL PEMBROOK,**
**JAMIE BALL, and MEGAN A. ROBB,**

        **Defendants.**

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court is a Motion to Dismiss filed by Defendants Randall Pembrook, Jamie Ball, and Megan A. Robb ("Defendants"). (Doc. 18). Plaintiff Maggie R. DeJong filed a timely response, to which Defendants filed a timely reply. (Docs. 20; 21). For the reasons set forth below, the motion is granted in part and denied in part.

DeJong brings this action pursuant to 42 U.S.C. § 1983 for violations of her First and Fourteenth Amendment rights while she studied in the Master of Art Therapy Counseling Program at Southern Illinois University Edwardsville ("SIUE"). (Doc. 1). She alleges that Defendants, current and former employees at SIUE, subjected her to retaliation for protected speech, to viewpoint and content discrimination, and to prior restraint of her protected speech. (*Id*.). In light of these claims, DeJong sues each defendant in their individual capacities and seeks declaratory relief as well as damages. (*Id*.).

Defendants move to dismiss DeJong's Complaint for failure to comply with Rule 8 and for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

(Doc. 18). Defendants argue that DeJong's complaint is neither short nor plain, that DeJong lacks standing to pursue declaratory relief, that DeJong cannot seek to invalidate school policies in this individual capacity suit, and that, in any event, Defendants are entitled to qualified immunity. (Doc. 19).

## Factual Background

From August 2019 until her graduation in May 2022, DeJong earned a Master of Arts in Art Therapy Counseling from SIUE, a public university organized under the laws of the State of Illinois. (Doc. 1, ¶¶ 33, 34, 111). Only twelve accredited schools across the nation offer a graduate degree in this field. (*Id.* at ¶ 51). Defendant Robb, an associate professor, directs the graduate Art Therapy Counseling Program ("Program"). (*Id.* at ¶ 42). The Program is relatively small, with only three professors including Robb, and approximately ten students in each cohort. (*Id.* at ¶¶ 53, 54). Another student in the Program ("Reporting Student") met with Robb on two occasions, October 26 and November 19, 2021, to report discomfort with many of DeJong's statements and social media posts. (Doc. 1-20). The statements and posts expressed views on vaccination mandates, political ideologies and groups, race relations in America, the January 6th insurrection, abortion, and religion, among other issues. (Docs. 1-20; 1-21). Robb referred the Reporting Student to Dean Kevin Leonard, who then directed the student to the Office of Equal Opportunity, Access and Title IX Coordination ("EOA"). (Doc. 1-20). The Reporting Student subsequently filed an EOA complaint on February 2, 2022. (*Id.*).

Eight days later, DeJong received three "no-contact orders" ("NCOs") issued by Defendant Ball, the Director of the EOA. (Doc. 1, ¶¶ 39, 110). Defendant Pembrook, the Chancellor of SIUE at the time, apparently authorized the issuance of the NCOs. (*Id.* at ¶¶ 35,

125). One NCO prohibited DeJong and the Reporting Student from having any contact with one another, and the other NCOs prohibited DeJong and two other students from having any contact as well. (Docs. 1-7; 1-8; 1-9). The NCOs did not accuse DeJong of violating any university policy, but threatened possible "disciplinary consequences" if any party violated the orders. (*Id.*). The NCOs provided no factual basis other than "upon information and belief that interactions between [DeJong] and [the other students] would not be welcome or appropriate at this time." (*Id.*). Initially, the NCOs expired at the end of the spring 2022 semester, however, they were rescinded eighteen days later on February 28, 2022. (*Id.*; Doc. 1, ¶ 154; Doc. 1-12). Two SIUE policies, 3C6 and 3C7, governed the NCOs. (Doc. 1, ¶ 128). According to DeJong's complaint, Pembrook was responsible for the enactment, amendment, and enforcement of these policies as Chancellor. (*Id.* at ¶¶ 37, 38).

Within the Program, the NCOs became common knowledge. (*Id.* at ¶ 204). During class, students described feeling a tension in the Program. (*Id.* at ¶¶ 205-06). On February 23, 2022, DeJong's counsel sent a demand letter to SIUE officials and issued a press release. (*Id.* at ¶¶ 153, 204). Five days later, the Daily Citizen published an article, including excerpts from an interview with DeJong's counsel, describing her situation and the NCOs. (*Id.* at ¶¶ 231-32; Doc. 1-11). The article used her name. (Doc. 1-11).

On March 1, the Program held a community meeting on campus, where the topic of the NCOs arose, and some students complained about DeJong's statements and social media posts. (Doc. 1, ¶¶ 216-20). Robb attended the meeting. (*Id.* at ¶ 221). She did not dispel any allegations against DeJong. (*Id.* at ¶ 222). Robb, as a follow-up to the community meeting, emailed the entire Program on March 3. (*Id.* at ¶¶ 238-39). In her email, Robb thanked the Program for sharing at the community meeting stating, "[t]he meeting shed light onto our

collective need to step up and into empowerment around ensuring anti- oppression acts in our community." (Doc. 1-18). The email referenced but pointedly did not comment on the "current investigation." (*Id.*). Robb also promised a revision of the Program's "annual student review" to remediate a perceived lack of "clear policy or consequence to oppressive acts." (*Id.*). The email contained an excerpt from the SIUE student conduct policy, which listed behavior considered misconduct that could be subject to discipline, and urged the Program "to uphold our standards of inclusion and care[.]" (*Id.*).

Alumni of the Program became involved as well. On February 28, DeJong received a message from a graduate of the Program, who worked at a local service provider where DeJong interned the year prior. (Doc. 1, ¶¶ 212-13). DeJong had also interviewed this alumna for an ethics class assignment. (*Id.*). In the message, the alumna requested that, if possible, DeJong interview someone else for the assignment as they had been informed of DeJong's "harassment to [a] black colleague." (Doc. 1-13). Robb later contacted another graduate of the Program to ask if they had seen the press about DeJong. (Doc. 1, ¶ 234; Doc. 1-17). Robb messaged, "I hope you can support her. She's burning bridges[.]" (Doc. 1-17).

Ten days after the EOA rescinded the NCOs, on March 10, DeJong received an email and case-closure memorandum from Ball. (Doc. 1, ¶ 156; Doc. 1-19). The email included the original complaint filed concerning DeJong and other supporting materials. (Doc. 1, ¶ 157; Docs. 1-19; 1-20; 1-21; 1-22). As explained in the memorandum, the EOA investigated allegations of religious and racial harassment/discrimination, ultimately determining that DeJong's conduct did not rise to the level of any policy violation. (Doc. 1-19). The EOA noted the temporal remoteness of the alleged conduct and the unwillingness of a "potential complainant/primary witness" to participate. (*Id.*).

Later that month, on March 27, a student in the program drafted a collaborative community letter regarding the Community Meeting and recent news articles. (Doc. 1-26). The student invited other students, alumni, and faculty to sign the letter. (*Id.*). Eventually, the SIUE student newspaper published the letter. (Doc. 1, ¶ 259; Docs. 1-28; 1-29). The letter did not directly identify DeJong. (Doc. 1-28). The SIUE student newspaper also published an article about the NCOs, which did identify DeJong as well as other students involved. (Doc. 1-29).

DeJong graduated from the Program in May 2022. (Doc. 1, ¶ 33). Due to her experiences in her last semester at SIUE, DeJong filed suit on May 31, 2022. (Doc. 1). DeJong believes that Defendants acted unconstitutionally causing censorship of speech and restriction of movement, along with anxiety, reputational harm, and future loss of employment, among other injuries. (*Id.* at ¶¶ 265-71). She seeks damages and declaratory relief from Defendants in their personal capacities. (Doc. 1).

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). To survive a Rule 12(b)(6) motion, a plaintiff only needs to allege enough facts to state a claim for relief that is plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In deciding a motion to dismiss under Rule 12(b)(6), a court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences in the plaintiff's favor. *Burke v. 401 N. Wabash Venture, LLC*, 714 F.3d 501, 504 (7th Cir. 2013). Taken together, the factual allegations contained within a complaint must "raise a right to relief above the

speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (internal citations omitted).

## DISCUSSION

Defendants move to dismiss DeJong's complaint for several reasons. First, Defendants argue that DeJong lacks standing to assert claims for declaratory relief, and any such claims are moot. Defendants also contend that, in this individual capacity suit, DeJong cannot seek to have SIUE policies declared unconstitutional. Next, Defendants assert that DeJong's claims are barred by qualified immunity. Lastly, Defendants stress that DeJong's complaint violates Federal Rule of Civil Procedure 8, as it is neither short nor plain.

## I.    Declaratory Relief

As an initial matter, DeJong sprinkles requests for declaratory relief throughout the counts in her complaint. She seeks a declaration that Defendants violated her constitutional rights, a declaration that the NCOs were unconstitutional, and a declaration that parts of SIUE's policies 3C6 and 3C7 are unconstitutional. Defendants argue that DeJong lacks standing to seek such declaratory relief and that her requests have been mooted by her graduation from SIUE.

### A.  Standing and Mootness

Defendants highlight that, to establish standing, DeJong must show an injury in fact, causation between the challenged conduct and her injury, and some likelihood that a favorable decision would remedy her injury. Defendants also assert that for DeJong to obtain declaratory relief, she must show that she is in immediate danger of sustaining some direct injury or that she will again be subject to the alleged illegality. According to Defendants, DeJong's only injuries regarding the NCOs and the school policies occurred prior to her graduation. Moreover, as the challenged SIUE policies only apply to university employees

and students, a declaration of their unconstitutionality would provide DeJong no remedy and would serve only as an advisory opinion about the policies and their potential impact on other non-party students or employees.

DeJong emphasizes that her requests for declaratory relief are paired with a request for damages. She argues that declaratory relief may proceed as a prelude to a claim for damages, citing to two Seventh Circuit opinions. (Doc. 20, p. 5); *see Johnson v. Meriter Health Services Employee Retirement Plan*, 702 F.3d 364, 369 (7th Cir. 2012) ("[A] declaration is a permissible prelude to a claim for damages, that is, to monetary relief for a concrete harm already suffered."); *see also Crue v. Aiken*, 370 F.3d 668, 677 (7th Cir. 2004) ("When a claim for injunctive relief is barred but a claim for damages remains, a declaratory judgment as a predicate to a damages award can survive."). This is the only argument DeJong offers in opposition to Defendants' motion to dismiss her declaratory relief requests.

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *N.J. by Jacob v. Sonnabend*, 37 F.4th 412, 420 (7th Cir. 2022); U.S. CONST. art. III, § 2. To meet Article III's standing requirements, a plaintiff must demonstrate:

> (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Moreover, "a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc.*, 528 U.S. at 185.

"[A] case is moot when the issues presented are no longer 'live' or the parties lack a

legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). Essentially, a case is moot if a court's decision can no longer affect the rights of litigants in the case before it. *Sonnabend*, 37 F.4th at 421. Ultimately, "[a] federal court has no authority to give advisory opinions or decide questions that cannot affect the rights of the parties." *Id.*

The first case passingly cited by DeJong is inapposite. In *Johnson*, the Court remarked "a declaration is a permissible prelude to a claim for damages" in a specific context. *Johnson,* 702 F.3d at 369. In that case, class members included former or retired employees who sought declaratory relief to increase their future entitlement to pension benefits and to reform the pension plan which could render the plan more favorable to all participants. *Id*. The consequences of a judicial order revising the retirement plan impacted the interests of the members seeking such relief. *Id*. As such, a live case between the plan and the former employees existed.

DeJong also cites *Crue*, where the plaintiffs sought declaratory relief that a recently retracted university no-contact directive violated their First Amendment rights. 370 F.3d at 676-77. While the university retracted the directive foreclosing injunctive relief, the Court permitted a declaratory judgment claim to proceed as a predicate to a damages award. *Id.* at 677. The current students and faculty challenging the retracted directive sought a declaration that the directive was unconstitutional, which allowed them to substantiate a claim for damages for violation of their First Amendment rights. *Id*.

Here, declaratory relief related to the SIUE policies is overwhelmingly precluded by the case law. When a plaintiff can no longer be subject to the enforcement of a policy, the plaintiff lacks standing to challenge the legality of that policy, and for the same reason such claim can be moot. For example, in *Feit v. Ward*, the Seventh Circuit held that a former

employee lacked standing to challenge the constitutionality of a Forest Service policy prohibiting employees from participating in spearfishing protests. 886 F.2d 848, 856-57 (7th Cir. 1989). The *Feit* Court reasoned that the plaintiff, as a former employee, could not seek relief that would impact only current employees. *Id.* Declaratory relief ultimately provided no benefit to the plaintiff. *Id.* The plaintiff argued he could be rehired by the department and subjected to the challenged policy once again, but the Court found this possibility purely speculative and not enough to create standing. *Id.* at 858. In another example, the Seventh Circuit found that a former middle school student, who challenged his school's dress code, lacked standing and his case was moot, because he ascended to high school and the middle school policy no longer applied to him. *Sonnabend*, 37 F.4th at 421; *see also Stotts. v. Community Unit School Dist. No. 1*, 230 F.3d 989, 990-91 (7th Cir. 2000) (high school graduate could not challenge high school basketball team's appearance regulations).

The Court finds that DeJong lacks standing to challenge SIUE's policies (3C6 and 3C7) because she is a former student, and a favorable decision regarding these policies would not remedy her alleged injuries. Since her graduation, DeJong is no longer subject to these policies. Even if the Court declared the policies unconstitutional, she would receive no benefit and such declaration would not impact her. Furthermore, there is no live issue regarding the policies with respect to DeJong, and she lacks a legally cognizable interest in the outcome of a determination of the constitutionality of the policies. Thus, not only does DeJong lack standing to assert these claims, but these claims are moot as well.

There is nuance, however, regarding the declaratory relief sought regarding the NCOs. The *Crue* case cited by DeJong is relevant to this form of declaratory relief. In *Crue,* when university students and faculty members intended to contact prospective student

athletes about the problematic nature of the school's mascot, the university chancellor issued a directive instructing all community members to refrain from contacting any prospective athlete without express authorization of the Director of Athletics. 370 F.3d at 676-77. The chancellor retracted the directive and resigned. *Id.* Nevertheless, the court permitted plaintiffs to proceed with their request for a declaratory judgment that the directive violated their First Amendment rights, as a predicate to their damages claim. *Id.* at 677-78.

Here, Defendants rightfully point out that *Crue* involved current students and employees, whereas DeJong is a former student. But the plaintiffs' relationship with the university did not impact the right to declaratory relief regarding the rescinded directive in *Crue*. Even if the *Crue* plaintiffs were former employees or students, a declaratory judgment that the directive violated their First Amendment rights would have brought the same relief to the parties, regardless of the fact that their relationship with the university had terminated. *See also Penny Saver Publications, Inc. v. Village of Hazel Crest,* 905 F.2d 150, 153-54 (7th Cir. 1990) (ordinance amendment did not render controversy moot because a live controversy existed as to whether the ordinance was unlawful by chilling plaintiff's advertisers' speech, thus entitling the plaintiff to damages); *cf. Brown v. Bartholomew Consolidated School Corp.,* 442 F.3d 588, 596 (7th Cir. 2006) (if a plaintiff seeks monetary damages alongside declaratory relief, the case is not moot even if the underlying misconduct that caused the injury has ceased). The same is true for DeJong—a declaration that the NCOs violated her First Amendment rights would affirm her entitlement to damages.

For Pembrook and Ball, the issuance of the NCOs represents their only action that possibly infringed DeJong's constitutional rights. A declaration of the unconstitutionality of the specific NCOs issued against DeJong predicates her damages claim against those two

defendants. Thus, the declaratory relief sought regarding the NCOs—not the policies behind them—is permitted to proceed. All other claims seeking declaratory relief are dismissed.

### B.  Individual Capacity

Another reason hinders DeJong's ability to receive a declaration that the SIUE policies are unconstitutional: DeJong sues Defendants only in their individual capacities. The available remedies differ for individual and official capacity suits. *See Ameritech Corp. v. McCann*, 297 F.3d 582, 586 (7th Cir. 2002) ("lawsuit[s] against a state official in his or her individual capacity . . . do not seek to conform the State's conduct to federal law; rather, such suits seek recovery from the defendant personally.").

Defendants here, in their individual capacities, have no power to enforce any SIUE policy. Only an official capacity suit, or perhaps a suit against a different defendant, could seek judgment declaring the SIUE policies unconstitutional. *See Feit,* 886 F.2d at 858 (7th Cir. 1989) ("[T]he equitable relief [requested]—a declaration that the policy is unconstitutional and an injunction barring the defendants from implementing the policy in the future—can be obtained only from the defendants in their official capacities, not as private individuals."). Thus, even if DeJong had proper standing and her claims were not moot, she could still not attain such declaratory relief from Defendants in their individual capacities. Her claims for declaratory relief regarding SIUE policies must be dismissed on this additional basis.

Specifically, Count Four must be dismissed in its entirety as it seeks only a declaration that the SIUE policies are overbroad. Parts of Count Two (claiming that the SIUE policies include a content-based restriction and empower officials to use unbridled discretion to target protected speech), Count Three (alleging the policies threaten future speech), and Count Five (seeking a declaration that the policies are void for vagueness) are also dismissed.

## II.     12(b)(6) Motion to Dismiss and Qualified Immunity

DeJong claims that Robb, Pembrook, and Ball all violated her constitutional rights by retaliating against and discriminating against the content and viewpoint of her protected speech posted on social media, expressed in class, and communicated in various ways to other students. She also alleges that Defendants Pembrook and Ball issued a prior restraint on her future speech and violated her due process rights. On the other hand, Defendants argue that DeJong has failed to state a claim upon which relief can be granted because Defendants are entitled to qualified immunity on all counts.

### A.  Qualified Immunity Standard

The doctrine of qualified immunity protects government officials from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019); *see Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To determine whether a right is clearly established, courts consider whether the violative nature of the particular conduct is clearly established in light of the specific context of the case. *Leiser*, 933 F.3d at 702. The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable government official that his conduct was unlawful in the situation he confronted. *Saucier v. Katz,* 533 U.S. 194, 202 (2001).

Although qualified immunity is an affirmative defense, once raised, the burden shifts to the plaintiff to defeat it. *Purvis v. Oest*, 614 F.3d 713, 717 (7th Cir. 2010). In demonstrating that the violated right was clearly established, "a plaintiff must show either a reasonably analogous case that has both articulated the right at issue and applied it to a factual

circumstance similar to the one at hand or that the violation was so obvious that a reasonable person necessarily would have recognized it as a violation of the law." *Howell v. Smith*, 853 F.3d 892, 897 (7th Cir. 2017) (internal quotation marks omitted). In other words, while there is no requirement the "very action in question" must have previously been held unlawful, there must be settled authority that would cause a defendant to understand the illegality of his action. *Id; Lewis v. Downey*, 581 F.3d 467, 478-79 (7th Cir. 2009).

Importantly, qualified immunity is an immunity from suit rather than a mere defense to liability. *Pearson*, 555 U.S. at 231. The doctrine stems from a desire to ensure that any insubstantial claim against a government official is resolved prior to discovery. *Id.* Accordingly, the Supreme Court has emphasized the importance of resolving immunity questions at the earliest possible stage in litigation. *Id.* at 232. But qualified immunity depends heavily on the facts of a case, and "a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds." *Reed v. Palmer*, 906 F.3d 540, 548 (7th Cir. 2018) (internal quotations omitted).

## B. Count One – Retaliation

Generally, "the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (internal quotations marks omitted). If adverse action is taken against the individual based on that forbidden motive, and other non-retaliatory grounds are insufficient to provoke the adverse consequences, the injured individual may generally seek relief through a First Amendment claim. *Id.* To substantiate a claim for First Amendment retaliation, DeJong must plausibly allege that (1) she engaged in activity protected by the First Amendment, (2) she suffered a deprivation that would likely deter First Amendment

activity in the future, and (3) the First Amendment activity was "at least a motivating factor" for the retaliatory deprivation. *Woodruff v. Mason,* 542 F.3d 545, 551 (7th Cir. 2008).

The first inquiry is whether DeJong has properly pleaded a constitutional violation against Defendants. As to the first element, it appears there is no dispute that DeJong engaged in activity protected by the First Amendment by voicing her political and religious beliefs in class, on social media, and through conversations with her fellow students. Moreover, there is also no dispute that her discussion with the media regarding the no-contact orders and the demand letter she sent to Pembrook constituted protected First Amendment activity. Moving to the second and third elements, the Court will evaluate Robb separately from Pembrook and Ball, as her conduct differs from that of the other two defendants. At this stage, all well-pleaded facts and reasonable inferences are construed in favor of DeJong. The Court will also consider, along with the allegations set forth in the complaint, all documents that are attached to the complaint, referred to in the complaint, and central to the complaint. *See Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

### i. Defendant Robb

The second prong of a First Amendment retaliation claim is subject to an objective test: whether Defendants' alleged conduct would likely deter a person of ordinary firmness from continuing to engage in protected activity. *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020). DeJong alleges that Robb directed the Reporting Student to report DeJong to a Dean at SIUE. On information and belief, DeJong alleges that Robb encouraged other art therapy students to report DeJong as well. After reading the Daily Citizen article, Robb reached out to an alumnus and presumed mentor to DeJong and messaged, "I hope you can support her. She's burning bridges[.]" Robb also sent an email to the Program as a follow-up to the community meeting

thanking the community for sharing honestly and committing to "anti-oppression" in their learning environment. The email also housed a link to the student conduct policy and included an excerpt of acts of misconduct that could subject a student to discipline. Robb further stated, "We cannot comment on the current investigation; however, the art therapy program and SIUE does [sic] not have a clear policy or consequence to oppressive acts. Therefore, we are revising our annual student review…[b]y ensuring documentation and remediation for both students' growing areas and misconduct whether in the classroom or outside."

Robb points out, understandably, that her email to the Program is devoid of any reference to DeJong. On the other hand, DeJong argues that, given the context and the small size of the Program, even without naming DeJong directly, everyone knew the target of the email, and Robb revealed that DeJong was under investigation and publicly accused her of oppressive acts and misconduct.

DeJong cites to *Bart v. Telford*, 677 F.2d 622 (7th Cir. 1982), to argue that Robb's "campaign of petty harassment" is actionable under the First Amendment. The facts given in *Bart* are minimal. In *Bart*, the plaintiff alleged that her supervisor "orchestrated a campaign of petty harassments" designed as punishment, including "baseless reprimands," an admonishment for endorsing a mayoral candidate at a press conference, and ridicule for bringing in a birthday cake for a coworker. *Id.* at 624-25. DeJong also points to *Dishnow v. School District of Rib Lake*, 77 F.3d 194 (7th Cir. 1996), to argue that Robb's false accusations against DeJong levied in retaliation for her protected speech violated the First Amendment. In *Dishnow*, a school district fired the plaintiff, a public high school guidance counselor, in retaliation for writing articles and letters considered scandalous and critical of the district. *Id.* at 196. The defendants publicly accused the plaintiff of fourteen specific acts of misconduct,

which were disseminated throughout the small community affecting the plaintiff's ability to find another job. *Id.* at 198.

Somewhat differently, here, Robb did not subject DeJong to any kind of reprimand, nor is Robb a supervisor for DeJong, though Robb is the director the Program in which DeJong participated. The allegations against Robb, especially viewed in isolation, seem trivial. First, the allegations in the complaint and attached documentation show that Robb directed the Reporting Student to have a conversation with Dean Kevin Leonard, who then referred the Reporting Student to the EOA office. Robb, as the Program director, advising a student of how to proceed with a potential complaint regarding another student is not the same type of "reprimand" or "humiliation" discussed in *Bart.* DeJong also alleges that Robb reached out to alumni to spread the narrative of DeJong "burning bridges." In reality, Robb reached out to a supposed mentor of DeJong, and the complaint omits a portion of the attached message which stated, "*I hope you can support her.* She's burning bridges" (emphasis added). Lastly, the email sent to the Program, as a follow-up to the community meeting, does not mention DeJong by name or reference any specific actions known to have been taken by DeJong (like specific viewpoints or social media posts) as oppressive acts or misconduct, unlike in *Dishnow*, where the defendants recounted fourteen specific acts damaging the plaintiff's reputation and leading to humiliation.

"Unconstitutional retaliation by a public official requires more than criticism or even condemnation." *Novoselsky v. Brown*, 822 F.3d 342, 356 (7th Cir. 2016). Importantly, the Court must also take into consideration Robb's own right to free speech in its analysis. *See Hutchins v. Clarke*, 661 F.3d 947, 956 (7th Cir. 2011). Generally, retaliation is actionable when a public official's statements rise to the level of threat, coercion, intimidation that punishment,

sanction, or adverse regulatory action will immediately follow, or profound humiliation. *Novoselsky*, 822 F.3d at 356-57. Public officials can face liability for retaliation by subjecting an individual to embarrassment, humiliation, and emotional distress, but such cases are limited by a high bar, usually only met in circumstances of the release of highly personal and extremely humiliating details to the public. *Id.* at 356. In absence of such threat, coercion, intimidation or profound humiliation, a public official's speech does not adversely affect a citizen's First Amendment rights, even if defamatory. *Hutchins*, 661 F.3d at 956 (citing *Owens v. Ragland*, 313 F. Supp. 2d 939, 949 (W.D. Wis. 2004) and *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 687 (4th Cir. 2000)).

Even viewing the allegations in the light most favorable to DeJong, positioning Robb's actions as a campaign of petty harassments leading to public humiliation seems like an aggrandizement. At this motion to dismiss stage, however, DeJong's claims survive, if not barely. Taking all of Robb's actions together, it is plausible that her actions intended to intimidate or humiliate DeJong. Robb reached out to at least one alumna, even though her messages suggest concern rather than animus towards DeJong, which could demonstrate an attempt to humiliate her by tarnishing her reputation or to intimidate her into silence. It may also be a reasonable inference that Robb reached out to the other alumna who DeJong previously interviewed, as that alumna stated that she had, "been informed of [DeJong's] harassment to [her] black colleague." Perhaps Robb's email concerning the community meeting could be construed as a public announcement of an investigation into DeJong and an accusation that DeJong committed oppressive acts or misconduct propped up with a threat to change the Program policies to address such misconduct. This could plausibly be read as an attempt to humiliate DeJong in front of her peers, which is amplified by the small

size of the Program and Robb's role as director. Viewed in this light, DeJong has plausibly pleaded that Robb's whole-Program email and contact to Program alumni could have deterred a person of ordinary firmness from continuing in protected activities.

The third element of DeJong's retaliation claim can be more easily assessed. DeJong's allegation that her "protected speech was at least a motivating factor in Defendant Robb's decision to take these actions," (Doc. 1, ¶ 279), is conclusory, and the Court need not consider it. But the alleged facts lead to a reasonable inference that Robb's statements and actions were, at least in part, motivated by DeJong's protected speech. For example, Robb's email could conceivably be read as condemning DeJong's statements and social media posts as oppressive while threatening that the conduct policy would be adjusted to account for such speech. Further, Robb's contact with one alumna specifically referenced the Daily Citizen article that featured DeJong. Interviews with the media are also protected speech. Considering these examples, it is a reasonable inference that DeJong's protected speech motivated Robb's conduct.

Because DeJong has properly pleaded a constitutional violation, Robb can receive qualified immunity only if her conduct was not clearly established as unlawful. In other words, there must be settled authority that would cause Robb to understand the illegality of her actions. An individual's right against retaliation for protected speech under the First Amendment is not a new constitutional principle. While the cases raised by DeJong are not completely on point, as noted above, the general contours of this right are sufficiently clear. DeJong clearly has the right, as enshrined in the First Amendment, to express her religious, political, and social views on her personal social media account and to engage in mutual conversations with fellow students regarding those opinions without fear of retaliation from

school officials. *See Mahanoy Area School District v. B.L.*, 141 S. Ct. 2038 (2021) (high school violated student's First Amendment rights by reprimanding her after posting vulgar and critical comments to social media while off campus); *cf. Nuxoll ex rel. Nuxoll v. Indian Prairie School Dist. No. 204*, 523 F.3d 668 (7th Cir. 2008) (high school could not prevent student from wearing a shirt saying "Be Happy, Not Gay" as it was speculative that the shirt would provoke harassment or poison the educational atmosphere); *cf. Snyder v. Phelps*, 562 U.S. 443, 461 (2011) (First Amendment protection extends to hurtful speech on public issues to ensure that public debate remains unimpeded).

If Robb, motivated by DeJong's statements and social media posts, did engage in a campaign to tarnish DeJong's reputation by reaching out to alumni and alerting the Program that DeJong faced investigation for misconduct and oppressive acts, or threaten punishment by promising to update the student conduct policy to include speech like DeJong's, then Robb should have known that these actions violated DeJong's First Amendment rights. Thus, at this stage, Robb is not entitled to qualified immunity on Count One. Of course, discovery may shed more light on these issues, and qualified immunity may be appropriate later in this litigation.

### ii.  Defendants Pembrook and Ball

DeJong alleges that Pembrook and Ball engaged in prohibited retaliation when they issued the NCOs against her. Again, it is undisputed that DeJong engaged in protected speech, the first element of her retaliation claim. The next element is whether she suffered a deprivation that would likely deter First Amendment activity. This element is easily handled. Construing all facts and inferences in favor of DeJong, issuing three official NCOs, in response to protected speech, would likely deter a person of ordinary firmness from

continuing to engage in protected activity, especially in this situation as Ball copied campus police on the NCOs, and DeJong faced disciplinary consequences for any NCO violation.

The last inquiry, whether the NCOs were issued in response to and in retaliation for the protected speech, is not quite as straightforward. DeJong's First Amendment activity must, of course, be at least a motivating factor for the retaliatory deprivation to substantiate this claim. DeJong alleges that Ball reviewed the student complaint and its supporting documents before issuing the NCOs eight days after receiving the Reporting Student's EOA complaint. Moreover, on information and belief, DeJong alleges that Pembrook knew of these materials before he authorized the NCOs as well. DeJong also alleges that her protected speech was at least a motivating factor in their decisions to take these actions.

A case-closure memorandum from Ball is attached to DeJong's complaint. (Doc. 1-19). The memorandum informed DeJong of the termination of the EOA investigation and included copies of the Reporting Student's initial complaint and supporting materials. (Doc. 1, ¶ 158; Docs. 1-20; 1-21; 1-22). The case-closure memorandum also stated a possible rationale behind the NCOs. Apparently, the NCO pertaining to the Reporting Student was issued based on the student's written complaint alleging that DeJong engaged in a pattern of behavior amounting to religious discrimination/harassment by sharing social media materials, telling the student of her doomed position in the event of a rapture, and recommending a podcast called "Demons are Real" to the Reporting Student. In its initial inquiry into the allegations, the EOA also learned that another student recalled that DeJong addressed a Black person using a racial slur and made a threatening statement to that student, and, thus, issued an NCO against that student (who was ultimately unwilling to participate further with the investigation).

To begin, the allegation that DeJong's speech motivated the decision to issue the NCOs is conclusory and not entitled to an assumption of truth. DeJong also asserts knowledge on behalf of Ball and Pembrook as to her speech. Of course, awareness or knowledge of the protected speech is one component of demonstrating speech as a motivating factor. *See Daza v. Indiana*, 941 F.3d 303, 309 (7th Cir. 2019) ("As a threshold matter, the plaintiff must show that the defendant was aware of the protected conduct."). Simply alleging that Ball and Pembrook knew of the protected speech, without more, would not lead to a reasonable inference that DeJong's speech motivated the issuance of the NCOs, because a fairly "obvious alternative explanation" for the issuance of the NCOs exists, s*ee Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009), that Pembrook and Ball issued the NCOs while further investigating the Reporting Student's formal complaint that DeJong perpetuated discrimination and harassment. (Doc. 1, ¶ 158; Docs. 1-20; 1-21; 1-22). For example, DeJong did not also allege suspicious timing (as the NCOs were issued promptly after receipt of the student complaint, not after the protected speech itself). But DeJong attached the Reporting Student's EOA complaint and the case-closure memorandum to her complaint, which both support the notion that Ball and Pembrook were motivated by DeJong's protected speech in issuing the NCOs. The case-closure memorandum appears to indicate that Pembrook and Ball considered DeJong's expressions of her religious and political beliefs with the Reporting Student in issuing at least one of the NCOs (while the other might have been based on threatening and racially charged remarks which may not qualify as protected speech depending on the investigation). Given the EOA complaint and memorandum, DeJong has properly pleaded that her protected speech was at least a motivating factor in the issuance of the NCOs. As such, she has properly pleaded a constitutional violation.

Again, because DeJong has properly pleaded a constitutional violation, Pembrook and Ball can receive qualified immunity only if their conduct was not clearly established as unlawful. In other words, there must be settled authority that would cause Pembrook and Ball to understand the illegality of their actions. As explained above with respect to Robb, an individual's right against retaliation for protected speech under the First Amendment is not a new constitutional principle. While DeJong does not raise any cases clearly establishing that the no-contact orders are unlawful, she provides analysis through *Tinker* and *Mahanoy* that schools may not restrict political speech that does not substantially disrupt university activities, especially off-campus speech on personal social media accounts. *See Tinker v. Des Moines Independent Community School District,* 393 U.S. 503 (1969); *see also Mahanoy,* 141 S. Ct. 2038 (2021). Moreover, government "officials can still be on notice that their conduct violates established law even in novel factual circumstances," if the state of the law at the time provided fair warning that their alleged conduct was unconstitutional. *Hope v. Pelzer,* 536 U.S. 730, 741 (2002). As described above with Robb, if Pembrook and Ball issued the NCOs motivated by and as retaliation for DeJong's statements and social media posts, they would have known that their actions infringed on DeJong's First Amendment rights. Thus, Pembrook and Ball are not entitled to qualified immunity at this stage as to Count One.

### C. Count Two – Viewpoint and Content Discrimination

Discrimination against speech because of its message is presumed unconstitutional, and the government may not regulate speech based on its substantive content or the message it conveys. *Rosenberger v. Rector and Visitors of University of Virginia,* 515 U.S. 819, 828–29 (1995). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.* at 829. Thus,

Page 22 of 27

viewpoint discrimination is an egregious form of content discrimination. *Id*. To substantiate a claim for First Amendment viewpoint and content discrimination, DeJong must show that (1) government officials regulated her speech and (2) that the regulation was motivated by the ideology or the opinion or perspective that she wished to express. *Id.*

### i. Defendant Robb

As to Robb, DeJong fails to state a claim in the first instance. The complaint is devoid of any allegations that Robb regulated or even attempted to regulate DeJong's speech. Even Robb's program-wide email promising to reevaluate the student conduct policy to account for oppressive acts cannot be considered a regulation. DeJong does not allege that Robb did, in fact, change the student conduct policy in a way that regulated her speech for its content or viewpoint. Again, to summarize, DeJong alleges that Robb directed students complaining of DeJong's statements to speak with Dean Leonard, contacted alumni to discuss DeJong's statements, revealed that DeJong was under investigation, and publicly accused DeJong of oppressive acts and misconduct. These actions do not constitute regulation or enforcement of a rule promulgated under the authority of the school as with the challenged actions in other content and viewpoint discrimination cases. *See Nuxoll*, 523 F.3d 668 (7th Cir. 2008) (student challenged a school rule, and its application, forbidding derogatory comments, oral or written, that referred to race, ethnicity, religion, gender, sexual orientation, or disability); *Papish v. Board of Curators of University of Missouri*, 410 U.S. 667 (1973) (graduate student challenged expulsion for distributing newspaper on campus with indecent speech in violation of a board bylaw and conduct code).

Even taking all well-pleaded allegations as true and drawing all reasonable inferences in DeJong's favor, DeJong fails to state a claim for content and viewpoint discrimination

against Robb. Her claims in Count Two against Robb must be dismissed.

### ii.    Defendants Pembrook and Ball

Moving to Pembrook and Ball, DeJong alleges that the issuance of the NCOs constitutes content and viewpoint discrimination. The NCOs regulated DeJong's speech in that she was prohibited from speaking to three specific individuals. As discussed above, the basis for issuance of at least one of the NCOs appears to be related to DeJong's expression of her religious and political views with the Reporting Student (whereas one of the NCOs may be related to racially charged or threatening language). Indeed, the Reporting Student referenced the religious and political beliefs expressed by DeJong that purportedly engendered fear during in-class discussions and caused emotional damage. While the NCOs are devoid of any restriction on speech of a certain subject matter or viewpoint, there is a reasonable inference that the orders apply to DeJong solely because of the content of the message she expressed in her posts and exchanges with other students. There is also no indication that, pursuant to SIUE policy or practice, NCOs are issued immediately after a student complaint is received against another student in a situation involving claims of harassment. Moreover, as discussed above with Count One, DeJong has plausibly alleged that her protected speech motivated Pembrook and Ball to issue the NCOs.

Therefore, DeJong has properly pleaded a constitutional violation against Pembrook and Ball for content and viewpoint discrimination. The qualified immunity analysis follows that in Count One. The right to be free from content or viewpoint discrimination is an established constitutional principle. Here, it would be clear to a reasonable university official that issuing NCOs to a student due to their expressed viewpoints on social media, in conversations with other students, and during class discussions collides with that student's

First Amendment rights. At this stage, Pembrook and Ball are not entitled to qualified immunity on Count Two.

### D. Count Three – Prior Restraint

Prior restraints, quintessential First Amendment violations, can be described as threatened penalties for future speech. *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009). The First Amendment protects speakers from such threats of punishment designed to discourage future speech. *Id.* "A public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230-31 (7th Cir. 2015). For the NCOs to constitute a prior restraint, DeJong must show that they entailed a threat to use state power against future protected speech.

In the Seventh Circuit, it is clearly established that a no-contact directive can qualify as a prior restraint. In *Crue v. Aiken*, a state university chancellor issued a "preclearance directive" under which "No contacts [were] permitted with prospective student athletes…by University students, employees or others associated with the University without express authorization of the Director of Athletics or his designee." 370 F.3d at 674–75. The chancellor threatened that any intentional violations of the directive would not be condoned. *Id.* at 675. The Seventh Circuit held, in 2004, that this directive violated clearly established First Amendment rights. *Id.* at 679-80. Certainly, the NCOs at issue are different than the directive in *Crue*, but there are pertinent similarities. Pembrook and Ball issued official NCOs to DeJong forbidding communication with a group of students, requiring that any necessary communication proceed through an official channel with approval, and threating punishment for violation of the orders

including speech directed to the individuals subjected to the orders.

Notably, no-contact orders can certainly be justified and are routinely permitted in the university setting, for example, regarding sexual harassment complaints and investigations pursuant to Title IX. But whether the NCOs pass constitutional muster is not yet the question before the Court.

Building upon the analysis with the prior counts against Pembrook and Ball, DeJong has plausibly pleaded that the NCOs were issued based on protected speech relating to her religious and political beliefs, and that the NCOs applied to her based on the content of the message she expressed in her posts and conversations. Moreover, the NCOs threatened punishment for future speech with three students and mandated that communication flow through a university official or approved third party. DeJong has plausibly alleged a violation of a constitutional right, and the law regarding that right against prior restraint on speech is clearly established. Again, at this time, Pembrook and Ball are not entitled to qualified immunity for Count Three.

### E.  Count Five – Due Process Violation

Defendants did not offer argument regarding DeJong's Fourteenth Amendment Due Process claim in Count Five. In the motion to dismiss, due process is mentioned only to describe the claims brought by DeJong. Thus, Defendants waived argument regarding qualified immunity and dismissal of the due process claim. For now, that claim remains.

## III.    Rule 8 – Short and Plain Statement

Lastly, Defendants argue that DeJong's complaint violates Federal Rule of Civil Procedure 8 by failing to state a claim that is both short and plain. *See* FED. R. CIV. P. 8. DeJong

contends that, though Defendants desire a shorter complaint with each count reflecting the specific relief sought, Rule 8 does not impose such requirements.

Notice sits at the heart of the Rule 8 pleading requirements. Where a lengthy complaint, even with superfluous matter, provides the defendant notice of the plaintiff's claims, dismissal is inappropriate under Rule 8. *Stanard v. Nygren*, 658 F.3d 792, 797-98 (7th Cir. 2011). Simply put, "undue length alone ordinarily does not justify the dismissal of an otherwise valid complaint." *Id.* at 797. If undue length is paired with some other insufficiency, like unintelligibility or incomprehensibility, a complaint may be justifiably rejected pursuant to Rule 8. *Id.* at 797-98. DeJong's complaint does not fall in the realm of unintelligibility and, as seen, successfully resists at least some of Defendants' arguments that it fails to state a claim. While quite detailed and lengthy, dismissal of DeJong's complaint is not appropriate under Rule 8.

## CONCLUSION

For these reasons, the Motion to Dismiss filed by Defendants Robb, Pembrook, and Ball (Doc. 18) is **GRANTED IN PART** and **DENIED IN PART**. All of Plaintiff Maggie DeJong's claims seeking declaratory relief for the invalidation of SIUE Policies 3C6 and 3C7 are **DISMISSED**. For this reason and to be clear, the Court **DISMISSES** Count Four in its entirety, along with parts of Counts Two, Three, and Five seeking to invalidate the policies. Additionally, the Court **DISMISSES** Count Two as to Defendant Robb. DeJong is granted leave to amend her complaint on or before **April 10, 2023**.

IT IS SO ORDERED.

DATED:   March 20, 2023

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**